UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

MODERN PLASTICS CORPORATION,

        Debtor.

_____/

NEW PRODUCTS CORPORATION and
UNITED STATES OF AMERICA,

        Plaintiffs,

v.

THOMAS R. TIBBLE, individually and in his
capacity as Chapter 7 Trustee, and FEDERAL
INSURANCE COMPANY,

        Defendants.

_____/

Case No. 09-00651
Hon. Scott W. Dales
Chapter 7

Adversary Pro. No. 13-80252

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
                 Chief United States Bankruptcy Judge

## I.  INTRODUCTION

This Memorandum of Decision and Order addresses a costly discovery dispute

between New Products Corp. (the "Plaintiff" or "New Products") and seven non-parties[1]

upon whom New Products served subpoenas *duces tecum*.  The court lays the blame for

this dispute squarely on the shoulders of Plaintiff's counsel who flouted the duty he owed

---

[1] In this opinion, the court will refer to all of the non-parties collectively as the "Recipients."  They are: Steven M. Siravo, Bank of America, N.A., Theodore B. Sylwestrzak, Esq., John G. Cameron, Jr., Esq., Dickinson Wright PLLC, 3 OCIR 337, LLC, and Evergreen Development Company, LLC.  The court will refer to Mr. Siravo and Bank of America collectively as "BOA," and to Messrs. Sylwestrzak and Cameron, and the Dickinson Wright law firm, collectively as "DW."  Finally, the court will refer to 3 OCIR 337, LLC and Evergreen Development Company, LLC, collectively as the "Harbor Shores Entities."

to the Recipients to avoid saddling them with undue burden and expense, then stubbornly exacerbated the problem by multiplying proceedings.

The court held two hearings in Kalamazoo, Michigan, in connection with this collateral controversy.  During the first hearing, held on April 16, 2015, the court considered the Motion for Protective Order (the "MPO," DN 86) and Plaintiff's Motion to Compel Non-Parties to Comply With Subpoenas (the "Motion to Compel," DN 93). After hearing the arguments of counsel, the court announced its intention to require the Recipients to produce documents, subject to the protections contemplated under the rules to mitigate the burden of compliance with the subpoenas.  The court and the litigants agreed that granting the MPO, pursuant to which the non-parties would comply with the Plaintiff's subpoenas, made the Motion to Compel moot.

During the second hearing, held on June 24, 2015, the court took evidence regarding the costs involved in complying with the subpoenas.  The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52, made applicable in this adversary proceeding by Fed. R. Bankr. P. 7052.[2]  For the following reasons, the court will shift the majority of the costs of compliance and discovery-related motion practice to New Products and its counsel.

## II.  JURISDICTION

The court has jurisdiction to resolve the adversary proceeding, including this discovery dispute, for the reasons set forth in the Memorandum of Decision and Order dated December 18, 2014 (DN 69).

---

[2] In this opinion, and unless otherwise indicated, a reference to a "Rule" shall mean one of the Federal Rules of Civil Procedure, generally incorporated into bankruptcy proceedings by one of the Federal Rules of Bankruptcy Procedure.  The main rule at issue in this controversy, Rule 45, applies in bankruptcy proceedings pursuant to Fed. R. Bankr. P. 9016.

### III.  ANALYSIS

**A.      Factual History**

On June 20, 2006, Bank of America's predecessor extended credit to Modern Plastics Corporation (the "Debtor") and secured its loan with security interests and a mortgage on the Debtor's factory located at 489 North Shore Drive, Benton Harbor, Michigan (the "Property").  On January 26, 2009, the Debtor filed a voluntary petition for relief under chapter 7 which created an estate including, among other things, the Debtor's interest in the Property.  Thomas R. Tibble was appointed as trustee (the "Trustee").

The Trustee episodically attempted to sell the Property, but was unable to close any such transaction.  On March 4, 2013, Bank of America assigned its note, mortgage, and other loan documents, but not the Property itself, to New Products, the Debtor's neighbor.  A little over six months after the assignment, New Products filed suit against the Trustee seeking to hold the estate and the Trustee accountable in damages for the diminution in the Property's value during the nearly five years it remained as property of the estate, on the theory that the Trustee breached his fiduciary duties to the bankruptcy estate, Bank of America, and to New Products.

On August 28, 2014, as part of the adversary proceeding against the Trustee, New Products issued subpoenas *duces tecum* pursuant to Rule 45 against BOA and DW. (Exhs. 1-3).  Each subpoena contained roughly 36 separate categories of requests reaching back almost ten years to January 1, 2005.

In response to the subpoenas, on September 4, 2014, Christina K. McDonald, an attorney at Dickinson Wright, made a request to New Products's attorney, Mark Demorest, on behalf of BOA and DW, for an extension (from September 15, 2014 to

October 31, 2015) to respond to the subpoenas, stating that "it will take quite some time and work to determine what might exist in response to the numerous requests." (Exh. 14).  In reply, the next day, through a series of emails, Mr. Demorest suggested that they talk after Ms. McDonald has "had a chance to review the Subpoena."  (Exh. 15, p.3). Ms. McDonald responded to Mr. Demorest by saying that the subpoenas were self-explanatory so there was no need to talk, she just wanted to know if Mr. Demorest would agree to an extension.  (Exh. 15, p.2).  Again, Mr. Demorest said they could discuss an extension when they communicated the next week.  (Exh. 15, p.1).  Ms. McDonald explained that BOA and DW needed an extension because of the scope of the request, the amount of preliminary work required, and the unavailability of personnel.  Furthermore, Ms. McDonald made a suggestion as to an approach between Mr. Demorest and BOA and DW that included filing a response, objections, and a motion for protective order, as well as a proposed date for an initial production of October 10, 2014.

Ten days later, on September 15, 2014, after hearing nothing back from Mr. Demorest regarding the September 5, 2014 proposal on how to proceed, Ms. McDonald wrote Mr. Demorest a letter (Exh. 16), and also served him with an objection to the subpoenas (the "Objection," attached as Exh. 2 to the MPO (DN 86)).  In the letter, Ms. McDonald balked at the enormous breadth and scope of the requests, the amount of work required to assess the demands, as well as the effort required to gather and produce potentially responsive materials.  She also stated that BOA and DW had very real concerns about the undue burden of the requests and the fact that Mr. Demorest had asked for items that he must know to be privileged communications.  Nevertheless, BOA and DW indicated that they were willing to proceed on a good faith basis, based upon the

assumption that they could come to some agreement with Mr. Demorest regarding the scope of the subpoenas, the ground rules for collecting electronically stored information, and the reimbursement of costs.

In the Objection, BOA and DW formally reiterated their opposition to the time period for compliance and the time frame of the subpoenas, as well as several other items. Further, the Objection states that BOA and DW must be compensated for all costs and expenses in complying with the subpoenas, that the demand for documents had placed an undue burden on them, and that the subpoena requests were overbroad, as well as vague and ambiguous. Regardless of this Objection, and comporting with the course of action they suggested in their letter to Mr. Demorest, BOA and DW kept working to gather responsive documents.

Instead of replying to Ms. McDonald's September 5 and 15, 2014 requests, Objection and proposal, on September 19, 2014, Mr. Demorest served another subpoena *duces tecum* pursuant to Rule 45 on 3 OCIR 337, LLC, also a client of Dickinson Wright and a one-time potential buyer of the Property that had an option to purchase which it never exercised. (Exh. 4). This subpoena contained 58 separate categories of mostly the same general requests reaching back almost ten years to January 1, 2005.

On September 23, 2014, Mr. Demorest replied to Ms. McDonald's September 15, 2014 letter stating that he wanted to set up a time to discuss the proposal and also noted that BOA and DW had had three additional weeks to respond to the subpoenas and should be able to do so shortly. (Exh. 17, p.1). Ms. McDonald responded to Mr. Demorest's email by reiterating that despite BOA's and DW's Objection, they had been working diligently to collect the necessary materials to his "extremely broad document

requests" but that three weeks had not been long enough. *Id.* Additionally, Ms. McDonald pointed out that they had yet to determine how many non-privileged documents existed and by what method they could be produced. *Id.*

Ms. McDonald sent Mr. Demorest a letter enclosing a proposed protective order (the "Proposed Protective Order," Exh. A), and inviting comments. Again, Ms. McDonald warned Mr. Demorest that they had spent "considerable time and effort" collecting documents. *Id.* at p.1. Specifically, Ms. McDonald outlined the steps they had taken to assemble the data and also quantified the gathered information as consisting of six boxes of hard documents and almost 8,000 emails that still required review. *Id.* She specifically advised Mr. Demorest that this number did not include the collection of BOA's email correspondence. *Id.* Because Ms. McDonald claimed it was impossible to review all of these documents by October 10, 2015, the date she previously suggested, she proposed a rolling document production and requested that Mr. Demorest provide them with suggestions for limiting search terms for electronic information retrieval and agree to a limitation of custodians. *Id.* at p.1-2. If Mr. Demorest was unable to fulfill this request, Ms. McDonald stated that they would "proceed as per above." *Id.* at p.2.

Again, instead of signing, negotiating, or in any way responding to the Objection, Proposed Protective Order, or this latest correspondence, on October 14, 2014, Mr. Demorest served Dickinson Wright with yet another subpoena *duces tecum* pursuant to Rule 45, this time against their client, Evergreen Development Company ("Evergreen"), another past potential purchaser of the Property. (Exh. 5). This subpoena contained the same 36 separate categories of general requests as served in the previous subpoenas, plus 21 more. It also reached back almost ten years to January 1, 2005.

Apparently, there was no more communication between the Recipients and Mr. Demorest from the date of the Evergreen subpoena to December 29, 2014. On December 30, 2014, Mr. Demorest sent an email to Ms. McDonald attempting to set up a meeting to talk about the subpoena requests. (Exh. B). Due to the holidays, no one involved in the subpoena requests was available to meet with Mr. Demorest. *Id.* at p.1. The court notes that Mr. Demorest, as of late December, still had not signed, commented on, or even rejected to the Proposed Protective Order.

During the drought of communication between Mr. Demorest and the Recipients, BOA enlisted the assistance of Huron Consulting Services ("HCS"), a consulting firm that helps corporate entities sift through e-data, such as email and e-documents. On or about November 1, 2014, HCS retrieved 602.96 gigabytes of data using the parameters of the subpoenas from the nine custodians BOA identified. For this, they charged $95.00[3] per gigabyte. (Exh. 7). Generally speaking, one gigabyte of data equals about 50,000 pages. After checking for duplicates, HCS was left with 276.87 gigabytes or roughly 2.8 million pages of documents. Next, using a variety of search terms and assistance from Dickinson Wright's lawyers to minimize the amount of potential documents that could be responsive to the BOA subpoenas, HCS generated about 15,500 potentially relevant data files. On December 5, 2014, HCS invoiced Bank of America $57,281.20 for these services. *Id.* The witness from HCS testified that Bank of America has paid this bill.

On January 5, 2015, Ms. McDonald sent an email to Mr. Demorest once again reiterating the undue burden of the subpoenas and Mr. Demorest's lack of a response to

---

[3] This rate is discounted from the usual charge of $350.00-$450.00 per gigabyte, largely due to Bank of America's generally high volume of requests and its long-standing relationship with HCS.

their October 2, 2014 letter, Objection, and Proposed Protective Order.  (Exh. 20).  Ms. McDonald further stated that the Respondents had thus far incurred about $150,000.00 in fees and expenses ($100,000.00 for BOA and $50,000.00 for DW and the Harbor Shores Entities) that they had every intention of seeking from Mr. Demorest and his client.  *Id.* at p.2.

Apparently, Mr. Demorest contacted Ms. McDonald by telephone the next day and objected to the impending request for $150,000.00 in costs, insisting upon the production of documents by the Recipients even without a protective order.  (Exh. D, p.1 and 2).  About a month later, he followed up this phone conversation with a letter reiterating his view that the costs were not reasonable.  (Exh. D).  In the letter, Mr. Demorest also stated that Dickinson Wright had failed to follow the requirements of Rule 45(d)(2)(B) by inadequately protecting its clients from undue expense in responding to the subpoenas, and by failing to invoke Rule 45(d)(2)(B) in the Objection served upon him on September 15, 2014.  *Id.* at p.1-2.  In addition, Mr. Demorest expressed his belief that, in the absence of a motion to quash the subpoenas and a corresponding court order, the Recipients should have stopped trying to respond to the subpoenas immediately upon serving him with the Objection.  *Id.* at p.2.  Nevertheless, and quite inconsistently, Mr. Demorest still demanded responsive documents without agreeing to or suggesting changes to the Proposed Protective Order.  *Id.*  In essence, he sought everything for nothing.

### B.    Procedural History

On March 10, 2015, the Recipients filed the MPO.  Almost a month later, on April 8, 2015, New Products filed its Motion to Compel.  After the litigants filed answers

to the respective discovery motions, the court conducted a hearing in Kalamazoo, Michigan, on April 16, 2015. After hearing from counsel, the court recessed and held a conference in chambers in an effort to reach consensus. When the court reconvened, the litigants announced that they had reached agreement on the material terms of a protective order, reserving the issue of the extent to which the court should shift to New Products the costs of compliance and the costs of bringing the MPO.

At the April 16, 2015 hearing, the court treated the MPO and the Motion to Compel as two-sides of the same coin. *See* Transcript of Hearing held April 16, 2015 (hereinafter "April Tr.") at 4:18-20. In fact, the Recipients' counsel was indifferent as to whether the court granted the MPO or the Motion to Compel, so long as the court protected his clients. *Id.* at 27:24-28:5.

At the conclusion of the hearing, the court and the litigants discussed the best way to memorialize the outcome of the hearing.

> THE COURT: All right. So, earlier in the presentation, you indicated that you don't really care whether you're compelled to produce the documents, or whether your protective order is granted. So how do you want to resolve the two motions that we have? The motion to compel and protective order. I indicated, and as you guys have said, too, you've got the protective order. I indicated I'm going to require the production, subject to the protective order along the lines you've described, with the little two-step procedure for the privilege log. In other words, you'll have a choice to decide whether you're willing to pay for what they estimate in good faith the costs will be. So does that mean your motion to compel is granted, or your motion to compel is denied, or the motion for protective order is granted, or what do you want to do?
> MR. KNAPP: I think it's mooted, Your Honor.
> THE COURT: Okay. So the entry of the protective order will moot the motion to compel. Is that okay with you?
> MR. DEMOREST: I think that's okay, Your Honor.

April Tr. at 65:19-66:14. The court summarized the outcome of the hearing, saying that "the long and short of it is the protective order is going to require [the Recipients] to produce the documents" and "New Products is going to have to pay [the Recipients] something to mitigate the expense." *Id.* at 68:1-11. The court reserved the question of the amount and nature of fee shifting. *Id.*; *see also* Stipulation Regarding Production of Information in Response to Subpoenas (DN 105) at ¶ 2; Order Approving Stipulation Regarding Production of Information in Response to Subpoenas (DN 108, and with DN 105, collectively the "Protective Order"). From the Protective Order, it is clear that the court was awarding relief under Rule 26(c) *and* Rule 45, even though it technically denied the Motion to Compel. *See* Protective Order at p.2 ("It is the intent of the Court that this Order incorporates all of the terms and conditions of the Stipulation and that the Stipulation, accompanied by this Order, serve as a protective order for purposes of Federal Rules of Bankruptcy Procedure 9016 and Fed. R. Civ. P. 45, Fed. R. Civ. Proc. 26(c)").

On June 24, 2015, after granting a one month adjournment to accommodate counsel for New Products, and after the litigants failed to reach agreement on the fee shifting issues reserved in the Protective Order, the court held an evidentiary hearing in Kalamazoo to consider the amount and nature of the costs to be shifted from the Recipients to New Products or its counsel.

During the evidentiary hearing, the court heard testimony from Craig Smith, of Huron Legal (a division of HCS in Charlotte, North Carolina), Daniel F. Gosch, Esq. (a partner at Dickinson Wright PLLC), and Mr. Demorest. In addition, mostly on

stipulation, the court admitted twenty documents offered in support of the Recipients'

case and five documents offered by New Products.

### C.   Legal Analysis

1.   In General.

The two rules at issue in this discovery dispute -- Rule 26(c) and Rule 45(d)[4] --

overlap to some extent, though there are important differences.[5]  Both aim to mitigate the

burdens of discovery by shifting costs upon a proper showing, but Rule 45 includes

additional protections designed to address the risks of putting the court's subpoena power

in the hands of an attorney, and allowing that attorney to wield that power against non-

parties.

There is authority for the proposition that when a court considers the burdens

associated with the service of a subpoena, it should generally apply Rule 45, which

specifically addresses abuse of the subpoena power, rather than the more general rubric

of Rules 26 and 37.  *Muslim Community Ass'n, supra* at fn.4 (directing Magistrate Judge

to consider discovery dispute through the lens of Rule 45 despite the parties' reliance on

Rules 26 and 37); *but see In re Morrealle Hotels*, LLC, 517 B.R. 184 (Bankr. C.D. Calif.

2014) (considering subpoena-related discovery dispute under both sets of rules).  For the

sake of completeness, however, and the manner in which the litigants framed the dispute,

---

[4] The court's analysis rests on the Federal Rules of Civil Procedure, and not on contract rights arising under the Loan Purchase and Assumption Agreement between Bank of America and New Products, which contract rights (and defenses) are expressly preserved.

[5] As Judge Duggan from the Eastern District of Michigan recently noted, ". . .[e]xpense shifting under Rule 37(a)(5) is mandatory, *United States v. Dynamic Visions Inc.*, __ F.Supp.3d __, 2015 WL 294378 (D.D.C. Jan. 23, 2015), while expense-shifting under Rule 45(d)(1) is discretionary.  *Legal Voice v. Stormans, Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013)." *See Muslim Community Ass'n of Ann Arbor v. Pittsfield Charter Twp.*, Slip Op. No. 12–CV–10803, 2015 WL 404145 (E.D. Mich. Jan. 29, 2015).

the court will address the controversy under Rule 26(c) and Rule 37(a)(5), as well as Rule 45.

Central to any inquiry under either set of rules is the goal of avoiding "undue burdens" associated with discovery, with a particular solicitude for strangers to the litigation such as the Recipients in this matter. In deciding whether a subpoena imposes an "undue burden" upon a non-party, the courts undertake "a case specific inquiry," considering "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *American Elec. Power Co. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999) (citations omitted). The court must consider, and weigh, the need of New Products for the discovery it seeks, against the burdens imposed on the Recipients. In this analysis, "the status of a person as a non-party is a factor that weighs against disclosure." *Id.*[6]

The court regards the subpoenas as unduly burdensome for several reasons. New Products framed the first of thirty-six enumerated categories of "documents" it sought from Bank of America[7] in extremely broad terms: "Any and all documents mentioning, referring to, or related to Modern Plastics or the Modern Plastics Property, from

---

[6] During this proceeding, the court learned that New Products and several of the Recipients have been involved in state court litigation regarding the development of real estate in which New Products claims an interest. The court suspects that the animus from that litigation which has lasted several years according to Mr. Demorest's testimony, and the suspicions of New Products that the Recipients have colluded with Mr. Tibble to harm its interests in that other litigation, inspired him to issue the subpoenas. The court's concerns about the motivation of New Product in issuing the court's process, however, is not crucial to the court's conclusion that the burdens of the subpoenas are undue. The court, in other words, agrees that in considering whether a burden is undue, it should put greater emphasis on the Recipients' burden than on the issuer's motive. *Morreale Hotels*, 517 B.R. at 193.

[7] New Products defined Bank of America to include its predecessor, LaSalle Bank.

January 1, 2005 to date." (Exh. 3). To maximize the reach of the subpoena, New Products's boilerplate language defined the term "document" to have the "broadest possible meaning," including an extensive array of tangible documents and electronically stored information. (Exhs. 1-5). Mr. Demorest, the attorney who signed the subpoena, testified that he has worked approximately thirty years as a litigator, and that he has read articles on "e-discovery," which is to say discovery of electronically stored information. Moreover, with his experience as a commercial litigator over three decades, including experience in litigation with major banking organizations, he must have known that the target of his subpoena is highly regulated and highly sensitive to customer privacy issues. This would mean, naturally, that addressing these concerns would take considerable time (including attorney time) and other resources.

Similarly, as an experienced litigator, who had to have known that serving a subpoena on a national law firm, such as Dickinson Wright, seeking documents including communications relating to matters in which the firm or its clients had been retained, would (as a matter of professional responsibility on the target's part) necessitate review for privileged communications and work product. *Angell v. Kelly*, 245 F.R.D. 135, 140 n.1 (M.D.N.C. 2006). Even if he failed to perceive this risk, he was reminded of it in Ms. McDonald's September 15, 2014 letter. (Exh. 16).

Nevertheless, heedless of these obvious burdens, Mr. Demorest issued subpoenas, as an officer of the court, that required a global banking giant and a national law firm -- neither a party to the litigation -- to produce documents involving their clients in thirty-six categories, covering nearly a decade, within a fortnight -- spanning the Labor Day holiday.

Mr. Smith, a representative of HCS, the company Bank of America retained to assist in complying with the production of electronically stored information ("ESI") credibly testified about the processing of ESI, the expense, and therefore the burdens. From this testimony, the court understands that it is not uncommon for big financial (and other) institutions to store large amounts of information in electronic format -- e-mails, spreadsheets, databases, and other documents. Typically, an institution such as Bank of America, when served with a subpoena seeking ESI, makes an initial effort to gather electronic data, measured in gigabytes, of potentially responsive information. To make this first cut, bank employees use date and other parameters (including the likely "custodians" of the information) to create a databank of information from throughout the organization to be further winnowed before production. *Cf. Coleman v. American Red Cross*, 23 F.3d 1091, 1098 (6th Cir.1994) (defendant would have been required "to search every file that exists" at its headquarters to locate requested documents). Mr. Smith testified that Bank of America identified approximately 603 "gigs" of data in need of additional refinement.

According to its usual process, Bank of America retained HCS to continue searching through the databank to separate responsive from unresponsive (and sensitive or privileged) documents. Mr. Smith testified that it charged the Bank $95.00 per gigabyte -- a discounted high volume rate -- resulting in a flat fee of $57,281.20. (Exh. 7). This figure covers the efforts of HCS's personnel (including contract attorneys) and admittedly non-proprietary search software and expertise in the field, but does not include the time expended by BOA's counsel in connection with the production. There was no evidence that BOA or its lawyers exaggerated the expense: the fact is that

discovery of ESI is expensive, especially given the breadth of the subpoena served by New Products on BOA in this case.

The court notes that the subject of this litigation -- Mr. Tibble as Trustee -- had no duty to New Products or involvement in the affairs of the Debtor until his appointment in 2009 as a chapter 7 bankruptcy trustee, calling into question the relevance of documents predating his appointment by four years. The half-hearted explanation about the value of the Property being relevant on the question of damages may explain the last category of documents in the subpoena directed to BOA, but the request seems almost an afterthought following the breathtaking, categorical enumeration that precedes it: "36. Any and all documents regarding the value of the Modern Plastics property from January 1, 2005 to date." (Exh. 1 and 3).

New Products's main argument against finding an undue burden relies on the fact that the Recipients timely objected to the subpoenas under Rule 45(d)(2)(A), thereby relieving themselves of the obligation to respond absent an order from this court under Rule 45(d)(2)(B). Citing *Angell v. Kelly*, *supra*, and *Tutor-Saliba Corp. v. United States*, 32 Fed. Cl. 609 (Fed. Cl. 1995), New Products contends that the Recipients created their own burden by continuing to gather documents in response to the subpoenas after they served their objections under Rule 45(d), and that the court should refuse to award costs after the Recipients had substantially complied with the subpoenas despite having objected. The court is not persuaded for several reasons.

As the drafters of Rule 45 noted, the rule does not preclude a non-party from seeking costs after substantially complying with a subpoena. "In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been

produced, provided that the risk of uncertainty is fully disclosed to the discovering party." Fed. R. Civ. P. 45 (1991 Committee Notes) (citing *United States v. Columbia Broadcasting Systems, Inc.*, 666 F.2d 364 (9th Cir. 1982)). The non-parties in *Columbia Broadcasting*, like the Recipients in this case, consistently reiterated their intention to seek reimbursement for compliance costs throughout the production, and the requesting party, like New Products in this case, turned a deaf ear throughout the production. The court agrees with the Ninth Circuit (and the drafters of Rule 45 who expressly cited *Columbia Broadcasting*):

> Accordingly, we have little sympathy on the facts of this case for the networks' lament that deferral of a Rule 45(b)(2) determination [of compliance costs] until after compliance with a subpoena may result in grave injustice by visiting liability for costs on parties, who cannot then escape the consequences.

*Columbia Broadcasting*, 666 F.2d at 368. Like the Ninth Circuit, the court sees no point in penalizing a cooperative witness who gathers documents while reaching out to the requesting party in an effort to limit the expense and delay for all concerned. *Id.* at 369 (citing Fed. R. Civ. P. 1). The cases upon which New Products relies for a contrary conclusion are distinguishable from the present dispute because the Recipients steadfastly reminded New Products of the expense of their production, sufficiently bringing themselves within the scope of *Columbia Broadcasting*. (Exh. 14, Sept. 4, 2014 email from Christina McDonald, Esq. to Mark Demorest, Esq., requesting extension of deadline to response because it will take "quite some time and work to determine what might exist in response to the numerous requests"); (Exh. 15, p.1, to similar effect); (Exh. 16, letter dated Sept. 15, 2014 from Christina McDonald, Esq., to Mark Demorest, Esq., describing "very real concerns about the exceedingly broad scope of the requests the undue burden

they place . . . the obvious request for what you must reasonably know to be privileged communications, and the ultimate purpose of your requests"); (Exh. 17, p.1, email from Christina McDonald, Esq., to Mark Demorest, Esq., advising that Recipients have been gathering documents despite their objection under Rule 45(d)(2)); (Exh. A, email dated Oct. 2, 2014 from Christina McDonald, Esq., to Mark Demorest, Esq., referring to "considerable time and effort" collecting documents, and proposing draft protective order).

In response to the Recipients' concerns about the obvious breadth and burdens of the initial subpoenas, Mr. Demorest responded essentially with: (i) three non-committal emails declining to relax deadlines while seeming to express a willingness to "talk next week" or some other time,[8] and (ii) new subpoenas directed at two more clients of Dickinson Wright with even broader document production requests and unreasonable response deadlines. He provided no comments on the Proposed Protective Order, and as far as the record is concerned, never acknowledged it until much later. According to the credible testimony of Mr. Gosch, from late October to late December, despite the Recipients' repeated complaint about the burdens of the subpoenas (especially with respect to ESI and privileged communications), communications from Mr. Demorest "went completely dark," meaning that the lawyers from Dickinson Wright heard nothing from him until late December, 2014.

Mr. Demorest's pretended reliance on some (but not all) of the terms of the Proposed Protective Order is similarly unpersuasive. During the June 24, 2015 evidentiary hearing, he attempted to persuade the court that he assumed the unsigned

---

[8] *See* Exh. 15, pp.1 and 3; Exh. 17, p.1.

draft (including the portion that stated each side would bear their own attorney fees absent a court order) would govern the production, yet elsewhere in his testimony he took pains to point out that there was no agreement reached regarding the document protection (presumably in an effort to bring this case within the terms of *Angell v Kelly*, *supra*, and similar authorities).  Mr. Demorest's explanation is implausible and not credible.  The form of the document itself -- crafted as a protective *order* -- certainly suggested judicial involvement, in addition to a formal signature indicating Mr. Demorest's assent.  Moreover, the cover email clearly invited comments, if not assent, as Mr. Gosch noted in his testimony.  From an attorney who has practiced for over 30 years, who is familiar with discovery of ESI in commercial litigation, and who certainly should have anticipated extensive attorney time in response to subpoenas directed at a law firm, the pretended explanation rings hollow, and the court does not credit it.  Moreover, the *Proposed* Protective Order -- even if Mr. Demorest had extended the Recipients the common courtesy of negotiating, rejecting, or agreeing to it -- did not waive the Recipients' request for attorney fees incurred in the production, but simply reserved the question pending later motions (which the Recipients and New Products eventually filed).  Again, an attorney with the experience of Mr. Demorest would have known this.  To react with surprise and shock in January, 2015 as Mr. Demorest did when Dickinson Wright lawyers provided firm numbers to quantify the earlier email warnings and predictions about the expense and burdens associated with the subpoenas is perplexing.

In his testimony on June 24, 2015, and in correspondence with Recipients' counsel,[9] Mr. Demorest tried to put the onus on Dickinson Wright to limit the burdens associated with the subpoenas that he issued as an officer of this court. In this way, he betrayed his misapprehension of his responsibility as an officer of the court in connection with the subpoenas, and flouted his clear duty to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Mr. Demorest and his client, rather than Dickinson Wright and theirs, had a duty to mitigate the burdens of the subpoenas, and must now bear the costs of their reckless disregard of this duty.

Given the breadth of documents covered by the subpoenas in terms of time periods and content, the nature of the primary targets of the subpoenas (a global financial institution and a 400-attorney national law firm), the non-party status of the Recipients without any interest in the outcome of the claims against Mr. Tibble, and the compressed (two-week) response-time unreasonably requested under each subpoena, the court easily concludes that the subpoenas imposed an undue burden on the Recipients. Indeed, for that reason it announced its intention to grant the MPO as a condition for compelling production. This conclusion has implications regarding the court's analysis concerning cost-shifting for motion practice under Rules 26(c) and 37, as well as compliance costs under Rule 45. *See* Fed. R. Civ. P. 26(c)(1) and 45(d)(1).

   2.   Rule 26(c)/Rule 37(a)(5).

The Recipients' MPO relies, in part, on Rule 26(c) which, upon a showing of good cause, authorizes the court to "issue an order to protect a party or person from

---

[9] *See* Exh. D, pp.1-2 (Letter dated Feb. 2, 2015 from Mark S. Demorest, Esq., to Christina K. McDonald, Esq., criticizing Recipients for failing to mitigate the burden of the subpoenas).

annoyance, embarrassment, oppression, or undue burden or expense . . .” Fed. R. Civ. P. 26(c)(1).  Significantly, Rule 26(c)(3) incorporates Rule 37(a)(5), which provides the following direction to the court:

> If the motion is granted -- or if the disclosure or requested discovery is provided after the motion was filed -- the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.  But the court must not order this payment if:
>
> (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
>
> (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
>
> (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5).  Because the court granted the MPO after concluding that the subpoenas imposed several undue burdens, under Rule 37(a)(5) the court “must” -- subject to two caveats not applicable here -- “require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.”  *Id.*  As for the caveats just mentioned, the record is replete with evidence of the good faith efforts of Dickinson Wright personnel to resolve the dispute before seeking judicial assistance.  Moreover, the court perceived not even a whiff of justification for the conduct of New Products or its counsel, in terms of avoiding undue burden resulting from the subpoenas, let alone a “substantial” justification, during the two hearings the court held in connection with the discovery dispute.

To illustrate, the court cites the undisputed evidence that the Recipients' counsel reasonably requested an extension of the 14 day response deadline prescribed in the subpoenas to produce the documents spanning nearly a decade, a request that ought to have been granted at once. Mr. Demorest's response smacked of indifference to the predicament his subpoenas imposed on the Recipients and their counsel, or worse. After Dickinson Wright promptly and thoughtfully drafted and shared with New Products the Proposed Protective Order and invited comments from Mr. Demorest in an effort to mitigate the expense of ESI (for example by limiting the time period, search terms, and the number of ESI custodians), Mr. Demorest offered nothing meaningful in response, not even a formal rejection of the proposal. Worse, Dickinson Wright personnel consistently advised Mr. Demorest of the steps they were taking to comply with the subpoenas notwithstanding their formal objection, all the while warning that the costs of compliance would be significant. (Exh. A, p.17 and 20). Mr. Demorest said nothing.

Even when, in frustration, the Recipients filed their MPO, New Products and its counsel declined to respond in a manner consistent with their duty under Rule 45(d)(1) to avoid imposing a burden in discovery. Instead, New Products opposed the MPO by filing a Motion to Compel the Recipients to comply with the overbroad and burdensome subpoenas without protection.

For similar reasons, the court finds no evidence of any circumstances making it unjust to require New Products and its counsel to bear the reasonable costs and attorney fees that the Recipients incurred in bringing the MPO.

### 3.    Rule 45(d).

In addition to cost shifting under Rule 37(a), the federal rules also require the court to shift the lion's share of the costs of compliance with the subpoenas to New Products, given the court's conclusion that they imposed an undue burden on the Recipients when, after objection, the court entered an order compelling production, as the court did on April 16, 2015. *See* Fed. R. Civ. P. 45(d)(2)(B)(ii). The applicable rule provides, in relevant part, as follows:

> If an objection is made, the following rules apply:
>
> (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
>
> (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

Fed. R. Civ. P. 45(d)(2)(B). While the Sixth Circuit has not yet given substantial guidance regarding Rule 45(d)(2), at least two other Courts of Appeals on both sides of the country have reached straightforward conclusions: "[O]nly two considerations are relevant" to the cost-shifting inquiry: "(1) whether the subpoena imposes expenses on the non-party, and (2) whether those expenses are 'significant.'" *Legal Voice v. Stormans, Inc.,* 738 F.3d 1178, 1184 (9th Cir. 2013) (adopting the rule set out by *Linder v. Calero–Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001)). A court "must order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder 'non-significant.'" *Id.* (citing *Linder*).

The court has already found that the subpoenas imposed an undue burden, and that New Products and its counsel took no meaningful steps to mitigate the burden. In addition, the court ordered the Recipients to produce the documents, albeit subject to protective provisions negotiated during the hearing on the MPO and Motion to Compel -- not before. Under the circumstances, and even though most of the expenses were incurred before entry of the Protective Order, the court will shift the costs of compliance from the Recipients to New Products and its counsel as the well-reasoned opinions in *Legal Voice* and *Linder* suggest. To accept New Products's argument based on Rule 45(d)(2) -- *i.e.*, that the Recipients must now absorb all compliance costs incurred after they served their Objections and that New Products is entitled to the documents at no charge -- would reward gamesmanship and punish cooperation. The court cannot countenance such a windfall on this record, and will not construe Rule 45 in this way. *See* Fed. R. Civ. P. 1.

### 4. Amount and Allocation of the Award.

In their closing brief, the Recipients ask the court to require New Products to reimburse Bank of America in the amount of $136,377.18, and DW and the Harbor Shores Entities in the amount of $96,078.81 for "all costs and expenses incurred in responding to New Products's Subpoenas." *See* The Subpoena Recipients' Post-Hearing Closing Statement in Support of Their Motion for Fees and Costs (DN 132, at p.15). The court has carefully scrutinized the evidence, and more specifically the invoices included as Exhibits 6-8, and has determined to award Bank of America $104,770.00, and the other Recipients, $61,417.50.

Mr. Gosch testified that he supervised the work his firm performed in connection with the subpoenas, and that the charges reflected on Exhibits 6 and 8 were actually incurred and generally paid. In addition, Bank of America paid the HCS invoice. (Exh. 7). The court does not doubt that Dickinson Wright performed the work billed on the invoices admitted during the hearing, and the fact that the Recipients paid the invoices might permit the court to infer that the charges were reasonable (on the theory that sophisticated commercial actors would not pay unreasonable charges). The court, however, is unwilling to abdicate its independent role (under the lodestar analysis) in assessing the reasonableness of the charges. As Mr. Demorest suggested during the cross-examination of Mr. Gosch, the finds that the substantial redactions within Exhibits 6 and 8 preclude it from performing this important function. *See* Transcript of Hearing held June 24, 2015 (hereinafter "June Tr.") at 110:23-111:3.

Rule 37(a)(5) specifically directs the court to award only "reasonable" fees, and while Rule 45(d)(2)(B)(ii) requires the court to shift compliance costs without qualifying that term, the court assumes that it need only shift the *reasonable* costs of compliance. Indeed, the court perceives no basis in rule or logic to shift unreasonable costs. The heavily redacted entries interfere with the court's ability to evaluate the reasonableness of the charges even if, as Mr. Gosch credibly maintained, the charges relate in some way to compliance with the subpoenas. *See* June Tr. at 111:1-8.

For example, the first entry for September 8, 2014, included on Invoice No. 960045, reads as follows: "Telephone calls and emails re:_____, 1.20 hours" valued at $555.60. (Exh. 6). Although the court does not doubt the fact the charge was incurred, it has no basis to evaluate the nature of the charge. This quoted entry is not an

isolated example. Indeed, as part of its review, the court has identified on Appendix A and B the entries which suffer from the same shortcoming and which the court will disallow as a result. Dickinson Wright did not offer to make an unredacted version available for *in camera* review.

Therefore, in making its award of attorney fees, the court has reviewed the Dickinson Wright invoices included within Exhibits 6 and 8, calculated the amounts charged to each set of clients (*i.e.*, $79,095.98 for Bank of America and $115,857.35 for the Harbor Shores Entities), and made the deductions for each set, as identified on Appendix A and B. In general, the court is not satisfied with the explanation for the disbursements and the reasonableness of the most-heavily redacted entries, and will therefore exclude these charges from its award.

With respect to Bank of America, the court finds that the HCS invoice (Exh. 7) in the amount of $57,281.20, which reflects a substantial volume discount and is supported by the credible testimony of Mr. Smith, is reasonable and completely compensable. It will allow Bank of America to collect that amount in full. As for the other charges, the following table summarizes the court's award in total:

| Client/Amount Billed/Vendor | Dates | Total Hours Reduced | Total Amount Reduced | Total Amount Allowed |
|---|---|---|---|---|
| BOA $79,095.98 (Dickinson Wright) | 09/08/15-04/20/15 | 102.80 | $31,607.18 | $47,488.80 |
| BOA $57,281.20 (HCS) | | NA | | $57,281.20 |
| BOA (Grand Total) | | | $31,607.18 | $104,770.00 |
| | | | | |
| Harbor Shores Entities $115,857.35 (Dickinson Wright) | 09/05/14-04/27/15 | 133.10 | $54,439.85 | $61,417.50 |
| Harbor Shores (Grand Total) | | | | $61,417.50 |

Finally, because the court has concluded that Mr. Demorest ignored his duty to minimize the burdens associated with the subpoenas, and because the court also concludes that the Plaintiff's opposition to the MPO was not substantially justified, the court must allocate its award as between Mr. Demorest[10] and the Plaintiff. *See* Fed. R. Civ. P. 37(a)(5) ("the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees"); Fed. R. Civ. P. 45(d)(1) (court must impose appropriate sanction "on a party or attorney who fails to comply" with duty to mitigate burden on non-parties).

The evidence admitted at the evidentiary hearing leads the court to want to place the blame squarely on Mr. Demorest. He was the attorney who issued the subpoenas and who dealt with Dickinson Wright lawyers after service. From his testimony, and that of Mr. Gosch, he appears to have been the architect of New Products's strategy in connection with discovery from the Recipients and the resulting litigation. Given the substantial amount of the award, the peculiar role that Mr. Demorest played in the unhappy dealings with the Recipients, and the absence of evidence implicating New Products or its principal in the litigation decisions, the court hesitates to impose the resulting burden on Mr. Demorest's client. Nevertheless, the Supreme Court's opinion in *Pioneer Investment Services Co. v. Brunswick Assocs., L.P.*, 507 U.S. 380 (1993), teaches

---

[10] The court has determined to impose the sanction upon Mr. Demorest personally, rather than his law firm. Unlike Fed. R. Bankr. P. 9011, which contemplates imposition of sanctions upon the party, the attorney, the law firm or all three, Rules 37(a)(5) and 45(d) mention only the attorney or the party, omitting any reference to a law firm.

that a client may have to suffer the consequences of the acts or omissions of its counsel under long-standing agency principles:

> Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.  Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

*Id*. at 396-97 (internal quotations and citations omitted).  Under this approach, the court must charge New Products with notice of the facts and circumstances that can be charged to Mr. Demorest.

Imposing the burden of the court's award on the Plaintiff itself has two additional benefits.  First, the point of Rules 37(a)(5) and 45(d)(2) is to compensate the Recipients. To give them access to two funds, rather than one, is consistent with this aim.  Second, Mr. Demorest and his client are in a better position to reach some accommodation among themselves about the allocation of the burden, as they are more keenly aware of the circumstances of their relationship.  If a dispute arises between them about the allocation, they can resolve it in a court of general jurisdiction, not this court of limited jurisdiction. Accordingly, the court will make New Products and Mr. Demorest jointly and severally liable for the award.  *See, e.g., Morrealle Hotels*, 517 B.R. at 205 (imposing joint and several liability for discovery sanction on counsel and client).

The awards in favor of the Recipients shall be remitted to Dickinson Wright, PLLC as their attorney, who shall allocate funds among its clients according to their respective shares of the invoices.

### IV. CONCLUSION AND ORDER

The burden that the subpoenas imposed and the Plaintiff's duty to avoid it were eminently foreseeable, and the court must now shift the costs as described in this opinion.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      Plaintiff and Mark Demorest are jointly and severally liable to Bank of America in the amount of $104,770.00, and shall pay that sum to Dickinson Wright, PLLC who shall hold the payment in trust, and distribute it to Bank of America;

2.      Plaintiff and Mark Demorest are jointly and severally liable to the Harbor Shores Entities in the amount of their respective shares of $61,417.50, and shall pay that sum to Dickinson Wright, PLLC, who shall hold the payment in trust, and distribute it to its clients, as their interest may appear.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Melissa L. Demorest, Esq., Mark S. Demorest, Esq., John Chester Fish, Esq., Cody H. Knight, Esq., Elizabeth M. Von Eitzen, Esq., Daniel F. Gosch, Esq., Scott Knapp, Esq., Mathew Cheney, Esq., and the United States Trustee.

### END OF ORDER

**IT IS SO ORDERED.**

**Dated July 23, 2015**



Scott W. Dales
United States Bankruptcy Judge

Appendix A

Dickinson Wright Charges to Bank of America

(Excluded from Award)

Source: Exhibit 6

| Invoice Number or Statement Date and Total Billed | Date | Hours Reduced | Amount Reduced |
|---|---|---|---|
| 960045/$5,632.85 | 09/08/14 | 1.20 | $ 555.60 |
| | 09/10/14 | 1.90 | $ 879.70 |
| | 09/18/14 | .30 | $ 138.90 |
| | 10/10/14 | .60 | $ 277.80 |
| | 10/30/14 | .50 | $ 132.50 |
| | Disbursements | | $ 16.75 |
| | Sub Total | 4.50 | $2,001.25 |
| 966207/$16,727.00 | 11/03/14 | .20 | $ 47.00 |
| | 11/04/14 | .60 | $ 277.80 |
| | 11/05/14 | .40 | $ 106.00 |
| | 11/10/14 | .50 | $ 231.50 |
| | 11/17/14 | .50 | $ 231.50 |
| | 11/18/14 | .20 | $ 53.00 |
| | 11/19/14 | .70 | $ 154.50 |
| | 11/21/14 | .20 | $ 47.00 |
| | 11/23/14 | .20 | $ 53.00 |
| | 11/24/14 | .10 | $ 23.50 |
| | 11/24/14 | .20 | $ 47.00 |
| | 11/24/14 | 1.20 | $ 210.00 |
| | 11/25/14 | 1.20 | $ 282.00 |
| | 11/25/14 | 2.70 | $ 715.50 |
| | 11/26/14 | .40 | $ 94.00 |
| | 11/26/14 | .50 | $ 132.50 |
| | 11/30/14 | 1.30 | $ 601.90 |
| | 11/30/14 | 5.50 | $1,292.50 |
| | Disbursements | | $ 19.30 |
| | Sub Total | 16.60 | $4,619.50 |
| 977631/$21,475.98 | 12/01/14 | .30 | $ 70.50 |
| | 12/02/14 | .80 | $ 188.00 |
| | 12/02/14 | .50 | $ 120.00 |
| | 12/04/14 | .10 | $ 23.50 |
| | 12/04/14 | .50 | $ 120.00 |
| | 12/05/14 | .30 | $ 137.40 |
| | 12/10/14 | .30 | $ 70.50 |
| | 12/11/14 | .30 | $ 72.00 |

| Invoice Number or Statement Date and Total Billed | Date | Hours Reduced | Amount Reduced |
|---|---|---|---|
| 977631 (cont.) | 12/18/14 | .20 | $    48.00 |
| | 12/19/14 | .40 | $   138.00 |
| | 12/19/14 | .20 | $    47.00 |
| | 12/19/14 | .10 | $    24.00 |
| | 12/22/14 | .20 | $    47.00 |
| | 12/30/14 | .10 | $    24.00 |
| | 12/30/14 | .40 | $   183.20 |
| | 12/31/14 | .70 | $   320.60 |
| | 12/31/14 | .20 | $    69.00 |
| | Disbursements | | $   720.98 |
| | Sub Total | 5.60 | $2,423.68 |
| 980560/$12,022.35 | Disbursements | | $    25.35 |
| | 01/03/15 | .20 | $    48.00 |
| | 01/05/15 | .50 | $   229.00 |
| | 01/05/15 | .20 | $    92.60 |
| | 01/05/15 | .20 | $    69.00 |
| | 01/05/15 | .50 | $   117.50 |
| | 01/05/15 | 1.10 | $   264.00 |
| | 01/05/15 | 3.50 | $   612.50 |
| | 01/06/15 | 3.80 | $ 1,311.00 |
| | 01/06/15 | 1.10 | $   258.50 |
| | 01/07/15 | 2.90 | $ 1,000.50 |
| | 01/07/15 | .20 | $    47.00 |
| | 01/07/15 | 1.00 | $   235.00 |
| | 01/07/15 | 1.70 | $   408.00 |
| | 01/08/15 | .40 | $   138.00 |
| | 01/08/15 | 2.40 | $   564.00 |
| | 01/08/15 | .10 | $    24.00 |
| | 01/09/15 | .50 | $   117.50 |
| | 01/09/15 | .20 | $    48.00 |
| | 01/11/15 | .40 | $    94.00 |
| | 01/11/15 | .10 | $    24.00 |
| | 01/12/15 | 1.10 | $   258.50 |
| | 01/12/15 | .40 | $    94.00 |
| | 01/12/15 | .30 | $    70.50 |
| | 01/12/15 | 1.10 | $   264.00 |
| | 01/12/15 | .40 | $    70.00 |
| | 01/13/15 | .40 | $   183.20 |
| | 01/14/15 | .40 | $    94.00 |
| | 01/14/15 | .30 | $    72.00 |
| | 01/16/15 | .60 | $   207.00 |
| | 01/16/15 | .30 | $    52.50 |

| Invoice Number or Statement Date and Total Billed | Date | Hours Reduced | Amount Reduced |
|---|---|---|---|
| 980560 (cont.) | 01/20/15 | .80 | $ 276.00 |
| | 01/20/15 | .40 | $ 96.00 |
| | 01/20/15 | 1.00 | $ 175.00 |
| | 01/21/15 | 1.20 | $ 414.00 |
| | 01/21/15 | .50 | $ 117.50 |
| | 01/21/15 | .10 | $ 23.50 |
| | 01/21/15 | .10 | $ 23.50 |
| | 01/21/15 | .50 | $ 120.00 |
| | 01/26/15 | .20 | $ 91.60 |
| | 01/26/15 | .60 | $ 207.00 |
| | 01/26/15 | .40 | $ 94.00 |
| | 01/26/15 | .50 | $ 120.00 |
| | 01/27/15 | .90 | $ 216.00 |
| | Sub Total | 33.50 | $9,067.25 |
| 984150/$10,654.50 | 02/01/15 | .20 | $ 69.00 |
| | 02/02/15 | .20 | $ 91.60 |
| | 02/02/15 | .30 | $ 138.90 |
| | 02/02/15 | .40 | $ 138.00 |
| | 02/02/15 | .10 | $ 23.50 |
| | 02/03/15 | .60 | $ 274.80 |
| | 02/03/15 | 1.40 | $ 336.00 |
| | 02/04/15 | .40 | $ 183.20 |
| | 02/04/15 | 1.60 | $ 552.00 |
| | 02/05/15 | .20 | $ 91.60 |
| | 02/05/15 | 3.20 | $ 1,104.00 |
| | 02/05/15 | .50 | $ 117.50 |
| | 02/05/15 | .80 | $ 192.00 |
| | 02/09/15 | .10 | $ 45.80 |
| | 02/09/15 | .30 | $ 138.90 |
| | 02/09/15 | 1.50 | $ 262.50 |
| | 02/09/15 | .20 | $ 35.00 |
| | 02/10/15 | .20 | $ 69.00 |
| | 02/10/15 | .50 | $ 87.50 |
| | 02/16/15 | 3.00 | $ 720.00 |
| | 02/16/15 | 1.50 | $ 262.50 |
| | 02/17/15 | 3.50 | $ 840.00 |
| | 02/18/15 | .70 | $ 320.60 |
| | 02/19/15 | .80 (out of 2.8) | $ 366.40 (out of $1282.40) |

| Invoice Number or Statement Date and Total Billed | Date | Hours Reduced | Amount Reduced |
|---|---|---|---|
| 984150 (cont.) | 02/19/15 | 1.10 | $ 509.30 |
| | 02/20/15 | .90 | $ 216.00 |
| | 02/21/15 | 4.50 | $ 1080.00 |
| | Disbursements | | $ 6.00 |
| | Sub Total | 28.70 | $8271.60 |
| 990435/$5,065.30 | 03/03/15 | 1.50 | $ 360.00 |
| | 03/04/15 | 1.10 | $ 264.00 |
| | 03/05/15 | 2.50 | $ 1145.00 |
| | 03/06/15 | 1.30 | $ 601.90 |
| 990435 (cont.) | 03/08/15 | .30 | $ 138.90 |
| | 03/09/15 | 1.20 | $ 288.00 |
| | 03/16/15 | .60 | $ 144.00 |
| | Disbursements | | $ 5.10 |
| | Sub Total | 8.50 | $2,946.90 |
| Proforma Statement as of 04/23/15/ $75,18.00 | 04/08/15 | 1.40 | $ 641.20 |
| | 04/21/15 | .20 | $ 48.00 |
| | 04/14/15 | .10 | $ 45.80 |
| | 04/17/15 | 1.40 | $ 641.20 |
| | 04/22/15 | .10 | $ 45.80 |
| | 04/22/15 | .20 | $ 48.00 |
| | 04/20/15 | .50 | $ 120.00 |
| | 04/18/15 | .30 | $ 137.40 |
| | 04/20/15 | 1.20 | $ 549.60 |
| | Sub Total | 5.40 | $ 2,277.00 |
| Exhibit 6/$79,095.98 | Total | 102.80 | $31,607.18 |

Appendix B

Dickinson Wright Charges to Harbor Shores Community Redevelopment Inc.

(Excluded From Award)

Source: Exhibit 8

| Invoice Number or Statement Date and Total Billed | Date | Hours Reduced | Amount Reduced |
|---|---|---|---|
| 955445/$22,139.10 | 09/05/14 | .50 | $ 75.00 |
| | 09/08/14 | 4.20 | $ 882.00 |
| | 09/09/14 | .20 | $ 83.00 |
| | 09/09/14 | 1.70 | $ 552.50 |
| | 09/10/14 | 1.60 | $ 336.00 |
| | 09/10/14 | 6.90 | $ 1,276.50 |
| | 09/11/14 | 3.20 | $ 672.00 |
| | 09/15/14 | .30 | $ 124.50 |
| | 09/17/14 | .10 | $ 32.50 |
| | 09/17/14 | 3.90 | $ 721.50 |
| | 09/22/14 | 5.30 | $ 980.50 |
| | 09/23/14 | .20 | $ 30.00 |
| | 09/28/14 | .50 | $ 162.50 |
| | 09/28/14 | .20 | $ 42.00 |
| | Disbursements | | $ 31.60 |
| | Sub Total | 28.80 | $6,002.10 |
| 962254/$28,669.60 | 10/01/14 | 2.10 | $ 388.50 |
| | 10/02/14 | 4.30 | $ 795.50 |
| | 10/06/14 | .50 | $ 107.50 |
| | 10/07/14 | .10 | $ 45.00 |
| | 10/07/14 | 6.20 | $ 1,147.00 |
| | 10/15/14 | | $ 105.00 |
| | 10/21/14 | .50 | $ 105.00 |
| | 10/21/14 | 2.70 | $ 499.50 |
| | 10/22/14 | .10 | $ 41.50 |
| | 10/31/14 | 2.00 | $ 370.00 |
| | Disbursements | | $ 134.60 |
| | Sub Total | 18.50 | $3,739.10 |
| 970312/$2,596.50 | 11/05/14 | .10 | $ 32.50 |
| | 11/21/14 | .30 | $ 135.00 |
| | Disbursements | | $ 5.50 |
| | Sub Total | .40 | $173.00 |

| Invoice Number or Statement Date and Total Billed | Date | Hours Reduced | Amount Reduced |
|---|---|---|---|
| 976528/$3,132.42 | 12/01/14 | .20 | $ 37.00 |
| | 12/16/14 | .30 | $ 124.50 |
| | 12/22/14 | .50 | $ 207.50 |
| | Disbursements | | $ 543.92 |
| | Sub Total | 1.00 | $912.92 |
| 983419/$10,460.81 | 01/02/15 | 1.20 | $ 252.00 |
| | 01/05/15 | .20 | $ 39.00 |
| | 01/07/15 | .10 | $ 21.00 |
| | 01/07/15 | 3.50 | $ 787.50 |
| | 01/08/15 | 6.40 | $ 1,440.00 |
| | 01/09/15 | .50 | $ 105.00 |
| | 01/11/15 | 4.50 | $ 1,012.50 |
| | 01/12/15 | 4.00 | $ 900.00 |
| | 01/13/15 | .40 | $ 166.00 |
| | 01/13/15 | .80 | $ 360.00 |
| | 01/13/15 | 1.70 | $ 357.00 |
| | 01/14/15 | 5.50 | $ 1,237.50 |
| | 01/15/15 | .30 | $ 63.00 |
| | 01/15/15 | 4.00 | $ 900.00 |
| | 01/19/15 | 3.00 | $ 675.00 |
| | 01/20/15 | .30 | $ 97.50 |
| | 01/20/15 | .80 | $ 168.00 |
| | 01/20/15 | .40 | $ 78.00 |
| | 01/26/15 | .20 | $ 83.00 |
| | Disbursements | | $ 88.31 |
| | Sub Total | 37.80 | $8,830.31 |
| 986778/$8,797.56 | 02/03/15 | .60 | $ 249.00 |
| | 02/03/15 | 1.30 | $ 273.00 |
| | 02/04/15 | .40 | $ 166.00 |
| | 02/09/15 | .10 | $ 41.50 |
| | 02/09/15 | 1.40 | $ 455.00 |
| | 02/09/15 | .20 | $ 39.00 |
| | 02/12/15 | 2.30 | $ 483.00 |
| | 02/13/15 | .90 | $ 189.00 |
| | | | |
| | 02/15/15 | 2.00 | $ 420.00 |
| | 02/16/15 | 2.90 | $ 609.00 |
| | 02/17/15 | 1.30 | $ 253.50 |
| | 02/18/15 | .20 | $ 42.00 |
| | 02/19/15 | 2.80 | $ 1,162.00 |
| | 02/19/15 | 1.00 | $ 325.00 |

| Invoice Number or Statement Date and Total Billed | Date | Hours Reduced | Amount Reduced |
|---|---|---|---|
| 986778 (cont.) | 02/20/15 | 1.00 | $ 210.00 |
| | 02/21/15 | 4.50 | $ 945.00 |
| | Disbursements | | $ 43.06 |
| | Sub Total | 22.90 | $5,905.06 |
| 993952/$7,568.32 | 03/03/15 | 1.50 | $ 315.00 |
| | 03/04/15 | 1.10 | $ 213.00 |
| 993952 (cont.) | 03/06/15 | 1.50 | $ 337.50 |
| | 03/08/15 | .40 | $ 84.00 |
| | 03/09/15 | 1.30 | $ 273.00 |
| | 03/10/15 | .50 | $ 105.00 |
| | 03/16/15 | .60 | $ 126.00 |
| | 03/17/15 | .20 | $ 65.00 |
| | Disbursements | | $ 2,068.32 |
| | Sub Total | 7.10 | $3,586.82 |
| | | | |
| Proforma Statement as of 04/23/15/ $32,493.04 | 04/08/15 | .20 | $ 83.00 |
| | 04/09/15 | .30 | $ 58.50 |
| | 04/09/15 | 3.30 | $ 1,369.50 |
| | 04/09/15 | 1.10 | $ 357.50 |
| | 04/09/15 | .60 | $ 126.00 |
| | 04/10/15 | 2.40 | $ 996.00 |
| | 04/10/15 | 1.40 | $ 455.00 |
| | 04/10/15 | .60 | $ 270.00 |
| | 04/13/15 | 1.00 | $ 415.00 |
| | 04/13/15 | .10 | $ 21.00 |
| | 04/14/15 | .10 | $ 41.50 |
| | 04/15/15 | .70 | $ 290.50 |
| | 04/18/15 | 2.50 | $ 525.00 |
| | 04/20/15 | .60 | $ 126.00 |
| | 04/21/15 | .60 | $ 126.00 |
| | 04/22/15 | .10 | $ 41.50 |
| | 04/27/15 | 1.00 | $ 210.00 |
| | Disbursements[1] | | $19,778.54 |
| | Sub Total | 16.60 | $25,290.54 |
| Exhibit 8/ $115,857.35 | Total | 133.10 | $54,439.85 |

---

[1] Based upon the total amount of fees and costs requested on behalf of Harbor Shores in The Subpoena Recipients' Post-Hearing Closing Statement in support of their Motion for Fees and Costs (DN 132), this amount was not included in the request, however it is reflected in Exhibit 8.