UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

MODERN PLASTICS CORPORATION,

        Debtor.

Case No. 09-00651
Hon. Scott W. Dales
Chapter 7

_____/

NEW PRODUCTS CORPORATION and
UNITED STATES OF AMERICA,

        Plaintiffs,

v.

THOMAS R. TIBBLE, individually and in his
capacity as Chapter 7 Trustee, and FEDERAL
INSURANCE COMPANY,

        Defendants.

Adversary Pro. No. 13-80252

_____/

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
                 Chief United States Bankruptcy Judge

## I.  INTRODUCTION

On July 24, 2015, the court entered two decisions in this adversary proceeding, in each instance ruling against New Products Corporation (the "Plaintiff" or "New Products").  On August 6, 2015, New Products timely moved for reconsideration of the decisions by filing separate motions.  The first motion seeks reconsideration of the court's decision[1] substantially granting the summary judgment motion filed by Thomas R. Tibble and Federal Insurance Company regarding the scope of the assignment

---

[1] *See* Memorandum of Decision and Order dated July 23, 2015 (the "Summary Judgment Order," DN 139).

from Bank of America (the "First Motion," DN 150). The second motion addresses the court's imposition of a subpoena-related discovery award[2] against New Products and its counsel (the "Second Motion," DN 151).[3] Shortly after filing the Reconsideration Motions, New Products filed a motion seeking to stay the Discovery Order (the "Stay Motion," DN 154).

The Stay Motion and the Reconsideration Motions are fully briefed, and the court has determined to resolve them without oral argument.

## II. ANALYSIS

1. <u>Reconsideration Standards</u>

The same standards govern both Reconsideration Motions. Generally speaking, reconsideration is available only in limited circumstances involving: (1) a clear error of law; (2) newly-discovered evidence; (3) intervening changes in controlling law; and (4) manifest injustice. *See GenCorp. Inc. v. American Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999); *In re No-Am Corp.*, 223 B.R. 512, 513 (Bankr. W.D. Mich. 1998).

Motions for reconsideration are "not an opportunity to re-argue a case" and should not be used by the parties to "raise arguments which could, and should, have been made before judgment issued." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998).

2. <u>The First Motion</u>

In its First Motion, New Products amplifies and supplements its earlier opposition to the Defendants' summary judgment motion, citing additional authority but nothing that

---

[2] *See* Memorandum of Decision and Order dated July 23, 2015 (the "Discovery Order," DN138).

[3] The court will refer to the First Motion and Second Motion collectively as the "Reconsideration Motions."

involves a change in controlling law.  The First Motion makes no suggestion about any newly-discovered evidence or, for that matter, manifest injustice.  Rather, it simply cites additional authorities that were available before the court entered its Summary Judgment Order.  Even if the newly-cited authorities qualified as a "change" or as "controlling" so as to warrant a second bite at the apple (which they do not), they are not particularly persuasive.

For the most part, the newly-cited authorities regarding the interpretation of assignments follow the same path the court took by scrutinizing the assignment language using principles of contract interpretation.  Not surprisingly, the courts identified in the First Motion reached a different conclusion because the assignment language in each case was broader than in the present.  The *Stewardship Credit* case, for example, relied on assignment language that conveyed not just the loan documents, but "causes of action" related thereto.  *See Stewardship Credit Arbitrage Fund LLC v. Charles Zucker Culture Pearl Corp*., 929 N.Y.S.2d 203 (N.Y. Sup. Ct. 2011).  Cases involving claims related to appraisal reports similarly make a much stronger case for including claims against third parties, particularly where such reports are specifically mentioned in the assignment documents.  For similar reasons, where an assignment specifically identifies claims against third parties involving specific transactions it is easy to regard such claims as within the scope of the parties' agreement.[4]

New Products's untimely citation to *Sweet v Clay*, 88 Mich. 1, 12, 49 N.W. 899 (Mich. 1891), is also unpersuasive.  That decision stands for the proposition that a fraud

---

[4] *See, e.g., FDIC v. Burke*, Slip Op. No. 12-7398, 2015 WL 404513 (D. N.J., Jan. 29, 2015) (appraisal reports mentioned and included in assigned loan documents); *see also Cannon Twp. v. Rockford Public Schools,* Slip Op. Nos. 320683 & 320940, 2015 WL 4249786 (Mich. Ct. App. July 14, 2015) (claims against third party specifically mentioned).

claim, which might not be assignable *in gross*, may be assigned as part of the assignment of a judgment. Given the contractual nature of any assignment, however, it is not fair to read that decision as broadly as New Products does.

*Sweet* merely recognized a bedrock principle of fraudulent conveyance law, albeit without citing the statute in effect at the time: "every conveyance, charge, instrument, or proceeding declared by law to be void as against creditors or purchasers, shall be equally void as against the heirs, successors, personal representatives or *assigns* of such creditors or purchasers." 2 How. Ann. St. § 6205 (1883) (emphasis added). Against this background, and given the facts before the court, it is not surprising the *Sweet* court permitted the assignee to sue insiders who tried to profit from transactions intended to hinder, delay, or defraud the assignor.[5] This is a simple application of black letter law, then as now.[6]

The court, however, does not read *Sweet* as undercutting the contractual nature of an assignment or the role that contract interpretation principles must play in resolving disputes about the scope of an assignment, as several of the cases cited by New Products confirm. Although remedies combatting fraudulent conveyances might automatically follow an assignment as a matter of law, the court adheres to the contractual approach of *Macomb Interceptor Drainage Dist. v. Kilpatrick,* 896 F. Supp.2d 650 (E.D. Mich. 2012),

---

[5] Indeed, the Michigan Supreme Court in *Jones v. Hicks*, 100 N.W.2d 243, 246 (Mich. 1960), distinguished *Sweet* on the ground that the complainant in *Sweet* was trying to reach tangible property fraudulently transferred, rather than assert a claim for damages against a third party. Similarly, the unpublished opinion in *Morris v. Schnoor*, Slip Op. Docket Nos. 315006 *et al*., 2014 WL 2355705 (Mich. Ct. App. May 29, 2014), *appeal denied,* 859 N.W.2d 514 (Mich. 2015), similarly recognizes the link between *Sweet* and the fraudulent conveyance laws.

[6] Current law, though using different phrasing, continues this idea. *See* M.C.L. § 566.34 ("[a] transfer made … by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made. . . if the debtor made the transfer . . .[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor.").

which states that "the ability of an assignee to enforce contractually-created rights does not necessarily permit the assignee to also bring tort or statutory claims that are merely related somehow to the contractual relationship but that arose outside of the rights created by the contract." *Id.*

Nor, for that matter, does *Pazdzierz v First Am. Title Ins. Co. (In re Pazdzierz)*, 718 F.3d 582, 587-88 (6th Cir. 2013), alter the court's analysis. That case did not involve the assignment of claims against a third party, such as Mr. Tibble, but only the assignor's claims against the original obligor under the note that was assigned. The Sixth Circuit simply held that the holder of the assigned claim may seek to prove that the claim should be excepted from discharge as a product of fraud under § 523(a)(2). A successful suit under § 523(a)(2) would only permit the assignee to enforce the obligor's original obligations to the assignor. Nothing in *Pazdzierz* involved conceptually distinct claims against a third party.

The First Motion pays only lip service to the standards governing reconsideration, and is an obvious and ultimately unsuccessful attempt to amplify its original papers with untimely argument. The Summary Judgment Order will stand.

3.     The Second Motion

In its Second Motion, New Products complains that the court made incomplete and inaccurate findings leading up to the Discovery Order, and did not separate its legal conclusions from its factual findings.[7] For example, New Products complains that it cannot tell whether the court's award of $104,770.00 to Bank of America and $61,417.50 to the Harbor Shores entities is justified under Rule 26, 37, or 45. New Products also

---

[7] Although the court made factual findings in resolving the discovery motions, it is not required to separately state factual and legal conclusions in motion practice. *See* Fed. R. Civ. P. 52(a)(3).

takes issue with many of the court's supposed findings, such as its motive in issuing the subpoenas and the reasonableness of the fees awarded.

In reaching its decision to shift the costs from the non-parties to New Products and its counsel, the court cited *Muslim Community Ass'n of Ann Arbor v. Pittsfield Charter Twp.*, Slip Op. No. 12-CV-10803, 2015 WL 404145 n.4 (E.D. Mich. Jan. 29, 2015), for the proposition that a court should consider a subpoena-related discovery dispute through the lens of Rule 45 despite the parties' reliance on Rules 26 and 37, because Rule 45 is the more specific rule.[8]  The court noted contrary authority, *see In re Morreale Hotels*, LLC, 517 B.R. 184 (Bankr. C.D. Calif. 2014), and stated that "[f]or the sake of completeness, however, and the manner in which the litigants framed the dispute, the court will address the controversy under Rule 26(c) and Rule 37(a)(5), as well as Rule 45." *See* Discovery Order at pp. 11-12.[9]  The court can appreciate the confusion that its approach might have engendered, and for clarity's sake now states that it shifted the expenses from Bank of America and the Harbor Shores entities to New Products and its counsel under Rule 45 as a means of enforcing counsel's duty to mitigate the burden of discovery on non-parties.  Because Dickinson Wright and its clients are non-parties, every dollar they reasonably spent in responding to the subpoenas, whether in reviewing documents for privilege, paying an ESI vendor, drafting and reviewing correspondence, or preparing for and appearing in court in formal litigation, they incurred as non-parties

---

[8] In this opinion, a reference to a two-digit rule (*e.g.*, "Rule 45") means one of the Federal Rules of Civil Procedure, as indicated, and a reference to a four-digit rule means one of the Federal Rules of Bankruptcy Procedure.

[9] The court proceeded in this fashion primarily to express its view, which it holds today, that New Products's opposition to the motion for protective order was not substantially justified, should an appellate court favor the rationale of *Morreale Hotels* over *Muslim Community Ass'n*.

protected from significant expense under Rule 45, and because Mr. Demorest ignored his duty under Rule 45(d)(1) to avoid exacerbating that expense.

The costs that the court shifted were admittedly significant, but under the circumstances, the court exercised its discretion to shift enough of the costs to New Products and its counsel so that the remaining cost to the non-parties would be, in the words of two Courts of Appeals, "non-significant." *See Legal Voice v. Stormans, Inc.,* 738 F.3d 1178, 1184 (9th Cir. 2013) (citing *Linder v. Calero–Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001)).

The court cannot say for certain how much of the non-parties' significant expense of compliance would have been avoided had Mr. Demorest fulfilled his duty to mitigate the burdens of the subpoenas. Consequently, it determined to impose the burden of that uncertainty upon the persons who created it—Mr. Demorest and his client—by shifting the significant compliance costs to them both.

For example, had Mr. Demorest meaningfully engaged with Dickinson Wright to develop an ESI protocol for the Bank of America subpoena, some or all of the Huron Consulting expense might have been avoided. Indeed, Mr. Demorest himself implies that a more targeted search might have cost as little as $190.00. *See* Second Motion at p. 17. Similarly, had he simply requested Mr. Siravo's work file (rather than ten years of documents in numerous categories from the entire Bank of America organization), it seems reasonably likely that any follow-up requests would have been more limited and, therefore, less burdensome to the bank. As for some of the other subpoenas, had Mr. Demorest refrained from serving them on lawyers and a law firm (and instead sought documents directly from the affected clients first), it is conceivable that much of the

expense of privilege review might have been avoided while securing the information that his client could legitimately expect to obtain.

Because his own misbehavior made it impossible to establish what portion of the compliance costs might have been avoided had he taken meaningful steps to limit the burdens of the subpoenas, the court visited the consequences of this uncertainty upon him by making him jointly and severally liable for the entire amount. He may reduce his share of these costs, without imposing additional expense or delay on the Defendants and the non-parties, by allocating the compliance costs between him and his client as they see fit. Nevertheless, having refused to mitigate the burdens that his actions imposed on non-parties, he can hardly complain that the court is exercising its discretion to enforce his duty under Rule 45(d)(1) by requiring him to share that burden with his client. The allocation risk is one that he, rather than the non-parties, must bear.

The balance of the Second Motion largely seeks to exploit immaterial defects in the court's decision,[10] or expresses disagreement with the court's factual findings, in some instances mischaracterizing the court's decision. For example, New Products suggests that the court relied on an erroneous conclusion about the company's motives in issuing the subpoenas, despite the court's statement that such motives were not "not

---

[10] For example, the court's opinion includes the following, technically incorrect, observation: "Again, instead of signing, negotiating, or in any way responding to the Objection, Proposed Protective Order, or this latest correspondence, on October 14, 2014, Mr. Demorest *served Dickinson Wright* with yet another subpoena *duces tecum* pursuant to Rule 45, this time against their client, Evergreen Development Company ("Evergreen"), another past potential purchaser of the Property." *See* Discovery Order at p. 6 (emphasis added). This sentence is technically inaccurate, as New Products served Evergreen, not Dickinson Wright. Nevertheless, the circumstances surrounding *service* of the Evergreen were never material. *See* Fed. R. Bankr. 9005. Rather, the point of that observation was that New Products and its counsel steadfastly ignored the legitimate concerns that Dickinson Wright lawyers had expressed about the scope of the original subpoenas, issuing a similarly burdensome subpoena on another entity (Evergreen) that, after years of litigation, Mr. Demorest almost certainly knew to be a client of the Dickinson Wright firm.

crucial to the court's conclusion that the burdens of the subpoenas are undue" and that the court was placing "greater emphasis" on the Recipients' burden than on the issuer's motive. *See* Discovery Order at p. 12 n.6 (citing *Morreale Hotels*, 517 B.R. at 193).

Similarly, New Products chides the court for finding that Bank of America and the Harbor Shores entities paid the Dickinson Wright invoices,[11] and for supposedly drawing an inference from the fact of payment that the fees it shifted were reasonable. *See* Second Motion at p. 7 ("In finding that the charges were reasonable, the Court relies in part on the fact that all of the invoices have allegedly been paid."). This argument plainly mischaracterizes the court's decision. *See* Discovery Order at p. 24 (after considering whether the fact of payment would support an inference of reasonableness, the court stated that it was "unwilling to abdicate its independent role (under the lodestar analysis) in assessing the reasonableness of the charges," and therefore independently considered the reasonableness of the charges).

The court finds in the Second Motion no basis for disturbing the Discovery Order.

4.      The Stay Motion

New Products and its counsel cite Rules 7062 and 8007 in support of an order staying the Discovery Order. More specifically, they ask the court to stay any effort to collect the discovery award for 14 days after entry of an order resolving the Second Motion. *See* Stay Motion at p. 2 (prayer for relief).

---

[11] It is specious to argue, as New Products does, that the unrebutted testimony of Mr. Gosch, without more, is insufficient to establish payment of the invoices. Testimony and documents are both competent evidence of payment and the rules do not favor one form over another. The court credited Mr. Gosch's testimony.

Rule 62 applies in adversary proceedings, according to Rule 7062.[12]   New Products and its counsel have already enjoyed the benefit of the automatic stay that Rule 62(a) affords, and now they seek an additional stay under paragraph (b) of that rule.  Rule 62(b) provides in relevant part as follows:

> (b) Stay Pending the Disposition of a Motion.   On appropriate terms for the opposing party's security, the court may stay the execution of a judgment—or any proceedings to enforce it—*pending disposition* of any of the following motions:
> . . .
>        (3) under Rule 59, for a new trial or to alter or amend a judgment . . .

Fed. R. Civ. P. 62(b) (emphasis added).  Putting aside the probably-fatal fact that New Products proposed no security, the italicized phrase demonstrates that relief under Rule 62(b) is available only "pending disposition" of the enumerated post-judgment motions, such as the Second Motion (ostensibly premised on Rule 59).  By resolving the Second Motion and the Stay Motion promptly and simultaneously, the court will render the Stay Motion moot, at least to the extent premised on Rule 62(b).

To the extent that New Products and its counsel seek to stay enforcement of the Discovery Order for 14 days *beyond disposition* of the Second Motion, they must look to a rule other than Rule 62(b).

The only other rule cited in the Stay Motion to support a stay of the Discovery Order is Rule 8007.[13]   That rule, however, requires the moving party to establish the well-

---

[12] For purposes of the Stay Motion, the court assumes that the Discovery Order is appealable, and therefore a "judgment" within the scope of Rule 62.  *See* Fed. R. Bankr. P. 9001(7) (defining "judgment" as any "appealable order").

[13] New Products has not filed a notice of appeal, but this procedural fact does not foreclose relief under Rule 8007.  *See* Fed. R. Bankr. P. 8007(a)(2).  Strictly speaking, however, New Products has not asked for a stay pending appeal, but only during the court's consideration of the Second Motion, and for 14 days thereafter.

settled (and recently cited) standards governing requests for stays pending appeal. *See In re Michigan Produce Haulers, Inc.*, Slip Op. No. 14-03188, 2015 WL 1275387 (Bankr. W.D. Mich. Mar. 19, 2015) (citing *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150 (6th Cir.1991)); *see also In re Grand Traverse Development Co. Ltd. P'ship.*, 151 B.R. 792 (W.D. Mich.1993).

More specifically, under Rule 8007(a) or (e), New Products must establish (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay, (3) the prospect that others will be harmed if the court grants the stay, and (4) the public interest in granting the stay.

For the reasons given above with respect to the Second Motion, the court is not persuaded that New Products has a likelihood of success on appeal from the Discovery Order.

Moreover, although New Products and its counsel may be harmed if they pay the funds as directed in the Discovery Order (and if it turns out that the court erred in so ordering), the resulting harm hardly seems "irreparable." In the event of reversal, repayment from an international banking giant is eminently likely, and New Products has given the court no reason to doubt the collectability of Dickinson Wright or the Harbor Shores entities.

As for the prospect of harm to others, the targets of New Products's subpoenas have already been harmed in the court's view by having to shoulder the expense of New Products's discovery requests. Postponing the relief prescribed in the Discovery Order would only continue that harm.

Finally, the court perceives no meaningful public interest in granting a stay. On balance,[14] the traditional factors do not favor granting a stay under Rule 8007. For these reasons, the court will deny the Stay Motion.

### III. CONCLUSION AND ORDER

The court previously considered and rejected New Products's strongest argument, namely that by filing their objections under Rule 45(d)(2)(B) the Recipients were absolved from complying with the subpoenas, and should have refrained from doing so. The court will not penalize the good faith cooperation of Dickinson Wright and its clients, and irrespective of the timing of the production, the court interprets Rule 45 as requiring it to shift the significant and reasonable expenses of a non-party's document production to the party requesting the information. New Products seems to argue, based on its reading of Rule 45(d)(2)(B), that it should have the documents produced in response to the subpoenas without paying the significant expenses in compiling them. Adopting this "have your cake and eat it, too" approach to Rule 45(d)(2)(B) would lead to a windfall for New Products at the expense of non-parties, promoting gamesmanship, incivility, delay and expense, contrary to the tenor of the federal rules and the better aspirations of practitioners in this District.

The court has considered the other arguments that New Products has advanced in support of the Reconsideration Motions and the Stay Motion and finds them without merit.

---

[14] *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985) (standards for stay are not "prerequisites that must be met" but considerations to be "balanced").

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      The First Motion (DN 150) is DENIED;

2.      The Second Motion (DN 151) is DENIED; and

3.      The Stay Motion (DN 154) is DENIED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Melissa L. Demorest, Esq., Mark S. Demorest, Esq., John Chester Fish, Esq., Cody H. Knight, Esq., Elizabeth M. Von Eitzen, Esq., Daniel F. Gosch, Esq., Scott Knapp, Esq., Mathew Cheney, Esq., and the United States Trustee.

**END OF ORDER**

**IT IS SO ORDERED.**

**Dated August 26, 2015**



Scott W. Dales
United States Bankruptcy Judge