UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

MODERN PLASTICS CORPORATION,

Case No. DK 09-00651

Hon. Scott W. Dales

Chapter 7

Debtor .

_____/

NEW PRODUCTS CORPORATION and
UNITED STATES OF AMERICA,

Adversary Pro. No. 13-80252

Plaintiffs,

v.

THOMAS R. TIBBLE, individually and in his
capacity as Chapter 7 Trustee, and FEDERAL
INSURANCE COMPANY,

Defendants .

_____/

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

I.  <u>BACKGROUND</u>

At the center of this dispute between an unhappy creditor and a bankruptcy trustee lies

a now-defunct manufacturing facility in Benton Harbor, Michigan (the "Property").   The

Property,  commonly known as 489 North Shore Drive, Benton Harbor, Michigan, served as

the factory, warehouse, and offices of Modern Plastics Corporation (the "Debtor"), as well as

the collateral for a prepetition commercial loan that Bank of America ("BOA") made to finance

the Debtor's manufacturing business.

The plaintiff in this case, New Products Corporation ("New Products" or the "Plaintiff"), is a "Tier 1" automotive supplier with its headquarters and manufacturing facility across the street from the Property. New Products, founded by the same man who established the Debtor and still managed by the founder's granddaughter, originally held a general unsecured claim against the Debtor in the amount of $19,113.82, but later acquired BOA's rights against the Debtor and the Property under a post-petition assignment of the bank's loan documents.

The principal defendant in this case is the former chapter 7 trustee, Thomas R. Tibble (the "Trustee" or "Mr. Tibble"). Mr. Tibble served as the trustee of the Debtor's bankruptcy estate from his appointment on January 26, 2009 until the charges of negligence (or worse) that New Products leveled against him prompted his resignation on January 9, 2015.[1] The Trustee's surety, Federal Insurance Company ("FIC"), is also a defendant. For convenience, the court will refer to the Trustee, the estate, and FIC collectively as the "Defendants."

Evidently frustrated with the Trustee's handling of the case, and seeing an opportunity to acquire the Property as a buffer against future development and possibly for future expansion of its own business, New Products succeeded to BOA's claims against the Debtor and its mortgage against the Property through a post-petition assignment, effective March 4, 2013 (the "Assignment Date").

New Products came to believe that, while the Property was within the bankruptcy estate and under the Trustee's aegis, scrappers freely entered the premises, removing copper wires, steel beams, piping, "bus ducts," lighting fixtures, plumbing fixtures, furnaces, even support

---

[1] Because New Products sued Mr. Tibble in his personal and official capacities, the successor trustee, Laura Genovich, appeared and participated in the case, through counsel, to protect the bankruptcy estate's interests following Mr. Tibble's resignation.

beams -- "everything that wasn't nailed down" and much of what was. The Plaintiff blames the Trustee for not taking steps to preserve the Property it eventually acquired an interest in, against the scrapping or looting.

A.      This Adversary Proceeding

A few months after the Assignment Date, after successfully opposing the Trustee's request to approve his final report of distribution, New Products sued the Trustee and FIC to recover from them the post-petition diminution in value of the Property that they attributed to the Trustee's alleged breaches of fiduciary duty to the estate, BOA and to New Products.

More specifically, and as set forth in its First Amended Complaint (the "Complaint," AP ECF No. 15),[2] New Products alleges that the Trustee breached his fiduciary duty:

> (1)      by failing to protect the Property against vandalism or looting (Complaint at ¶¶ 23, 42, 46, 47);
>
> (2)      by failing to insure the Property after BOA said it would no longer do so (*id.* ¶¶ 23, 62, 65);
>
> (3)      by failing to object to property tax assessments (*id.* ¶¶ 23 and 68);
>
> (4)      by failing to determine environmental contamination on the premises (*id.* ¶¶ 23, 51);
>
> (5)      by failing to maximize the value of the Property through sale (*id.* ¶ 20) or jumping to the conclusion that only the developers of the nearby "Harbor Shores" golf course would be interested in buying it (*id.* ¶ 28); and
>
> (6)      by leasing the Property as a parking lot to Harbor Shores for too little income (*id.* ¶¶ 37-40).

---

[2]  In this opinion, the court will refer to entries in the docket of the Adversary Proceeding as "AP ECF No. __" and to entries in the main bankruptcy base case docket as "BC ECF No. __."

The Defendants, in contrast, contend that the Property was "underwater," not necessarily because of the leaking roof and standing water within the building (which largely predated the bankruptcy filing) but because the unavoidable liens against the Property greatly exceeded its value. Without any equity for the estate, and because BOA had no interest in going out-of-pocket to protect or insure its own collateral, the Defendants contend that the Trustee acted appropriately by, in effect, holding onto the Property and generating income from it, such as a carve-out, option payments, and parking lot license fees, without expending any resources or effort to preserve it. They contend, without contradiction, that BOA acquiesced in this approach for more than four years, never objecting, nor requesting adequate protection, nor moving for relief from stay, nor to compel abandonment.

After six motions for summary judgment,[3] the court narrowed the issues by (1) precluding New Products from recovering damages caused by the Trustee's decision to cancel the casualty insurance (*see* Memorandum of Decision and Order, AP ECF No. 88); (2) limiting the Trustee's personal liability to any willful breach of duty (*id.*); and (3) holding that New Products purchased only BOA's contract rights against the Debtor but not any of the tort claims BOA may have had against the Trustee (including claims that BOA may have been able to assert for pre-assignment breaches of fiduciary duty). *See* Memorandum of Decision and Order, AP ECF No. 139 p. 5. This last point means that New Products could assert only the direct claims it might hold against the Trustee for the diminution of the Property's value that occurred between the March 4, 2013 Assignment Date, and January 6, 2014 (the date the Trustee technically abandoned the property). *Id.* at p. 8.

---

[3] *See* AP ECF Nos. 56, 57, 118, 182, 183, 184.

In a prior ruling, the court also concluded that the Trustee's duty to use estate resources to preserve or improve the Property would depend almost entirely upon whether there was equity in the Property that would inure to the bankruptcy estate.  *See* Order Denying Parties' Summary Judgment Motions and Bifurcating Issues for Trial, AP ECF No. 188.  In other words, bankruptcy trustees must not use estate resources if doing so will benefit only secured creditors. *Id.; cf.* 11 U.S.C. § 506(c) (authorizing trustee to surcharge collateral).[4]

Given this view of a trustee's duty and the allegations seemingly premised on the notion that the Trustee ought to have used estate resources to protect and enhance the value of the Property, the court bifurcated the issues for trial, focusing first on the Property's value and whether there was any equity in it.  Given the central role that the Property's value played in the pre-trial motion practice, the court hoped that an early decision on this issue would assist it in determining whether the Trustee violated his duty to preserve the Property before reaching other issues regarding the Trustee's breach of fiduciary duty, whether the breach caused any damages, and if so, the amount of those damages.  *See* Order Denying Parties' Summary Judgment Motions and Bifurcating Issues for Trial, AP ECF No. 188, at p. 4.  Thus, the first phase of trial, which began on January 14, 2016, was limited to establishing the value of the Property as of March 4, 2013, as well as the extent of the encumbrances against it.

In response to a motion *in limine,* which the Defendants filed mainly to exclude the testimony of New Products's expert witness, New Products conceded that it was taking an unconventional approach to valuation in that, instead of appraisers and real estate professionals, it would depend upon the vice president of a commercial construction firm to testify about the scrap value of the components of the building.  New Products argued that the value of these

---

[4] All statutory references in this opinion refer to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, unless otherwise indicated.

parts exceeded the "market value" of the Property, as would be determined by the more traditional valuation methodologies, used by appraisers, such as the sales comparison approach. In other words, New Products's theory rested on proving that the value of the damaged and purloined parts of the building exceeded the amount of the encumbrances, which would result in the equity necessary to trigger the Trustee's fiduciary duty to protect and insure the Property (against damage)[5] for the benefit of the estate and thus, the unsecured creditors.

B.        The First Phase of Trial

The first phase of the trial commenced with New Products's calling Michael Frederick to the stand.  Mr. Frederick is the vice president of Frederick Construction, and is the expert witness that New Products retained under Rule 26(a)(2)(B).  New Products also presented the live testimony of two men associated with Randy's Metal Recycling (Nicholas Schlipp and his grandfather, Delbert Schlipp), before concluding its presentation of live testimony with Cheryl Miller, the chief executive officer of New Products.

With the agreement of the parties, the court also admitted the transcripts of deposition testimony from Steven Siravo and Ronald Miller pursuant to Rule 32(a)(4).  The court has reviewed the deposition transcripts, paying particular attention to the Plaintiff's bench-filed designations of "key portions" to which the Plaintiff has called the court's attention.  *See* Plaintiff's Designations of Key Portions of Deposition Transcripts (AP ECF Nos. 270 and 271).

During New Products's presentation of its case, the court admitted numerous documents into evidence, including the Stipulation of Facts (Exh. BBBB).  Many of the documents were

---

[5] Nothing in this (or any prior) opinion of the court should be read to suggest that a trustee need not obtain *liability* or other types of insurance designed to manage other types of risk that a bankruptcy trustee or estate may face. For example, the judgment in this case might be different if, instead of facing a secured party at trial, the Trustee faced the parents of a child who wandered onto the Property.  Today's dispute involves the failure to protect the Property, not third parties.

culled from filings in the base case and adversary proceeding, others (such as email strings, appraisal documents, correspondence and invoices) were duly produced during discovery. The court received the specifically-identified documents into evidence, largely without controversy, based on the parties' pre-trial stipulation.[6]

The court's decision to exclude the opinion of the Plaintiff's only expert, Mr. Frederick, eviscerated the Plaintiff's case,[7] leaving Plaintiff's counsel to grasp at various straws from within the record to establish value. This setback, coupled with their view of the record generally, probably precipitated the Defendants' oral motion under Rule 52(c) (the "Rule 52 Motion"), which they made at the conclusion of New Products's presentation.

C.      Rule 52 Motion for Judgment on Partial Findings

In their Rule 52 Motion, the Defendants argue that the Plaintiff presented no evidence even tending to undermine the absence of equity as embodied in the Stipulation of Facts. (Exh. BBBB, ¶ 5). Because of the signal role of equity following the court's prior decisions in the case, the Defendants further asked the court to find that Mr. Tibble did not breach his duty to New Products, and therefore to enter judgment dismissing the case entirely.

---

[6] The court admitted only a subset of the documents the parties agreed *could be admitted,* as set forth in their pretrial Stipulation Regarding the Admissibility of Exhibits (AP ECF No. 245). The rules assign to the court the task of admitting evidence, and the court does not feel bound to admit documents *en masse* simply because the parties so stipulate. Instead of adopting the parties' "wholesale" approach, the court adopted a "retail" method, requiring document-specific offer and admission of exhibits. The court proceeded in this fashion to produce a more focused and manageable record for trial and perhaps appeal.

[7] In denying the *in limine* motion as it pertained to Mr. Frederick's opinion testimony, the court warned New Products that it would not permit the witness to stray too far away from his supposed report -- the September 2015 letter identified as Exh. 28 (not admitted but included as part of Defendants' Motion *in Limine*, (AP ECF No. 213-7)). At trial, in response to Defendants' objections to the basis for the opinion testimony, including the fact that Mr. Frederick purported to rely on matters not mentioned in the report, the court refused to admit his opinion on two grounds. First, allowing him to bolster his opinion with matters not mentioned in the "report" unfairly surprised the Defendants, and second, the apparently casual conversations with vendors (whose names he could not initially recall) and his reference to a website on the cost of various metals (not disclosed in the report and only hazily recalled during his testimony) did not qualify as "sufficient facts or data" on which to base his testimony under Fed. R. Evid. 702(b). As a result, the court refused to admit Mr. Frederick's opinion that the scrap value of the Property exceeded the encumbrances.

Rule 52(c), which applies in this adversary proceeding by virtue of Fed. R. Bankr. P. 7052, provides as follows:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 52(c). This rule permits, but does not require, a court to enter judgment after the conclusion of a plaintiff's proofs in non-jury trials. *Ingham County v. Strojny (In re Strojny),* 337 B.R. 150, 154 (Bankr. W.D. Mich. 2006).

Rule 52 is useful when the plaintiff has not demonstrated the elements of its claim either in fact or law, or where the plaintiff's own evidence may have established one of the defendant's defenses as a matter of fact or law. *Eberhardt v. Comerica Bank,* 171 B.R. 239, 243 (Bankr. E.D. Mich. 1994) (*citing CMS Software Design Systems v. Info Designs, Inc.,* 785 F.2d 1246, 1248 (5th Cir. 1986)).[8] The rule "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence." Fed. R. Civ. P. 52(c), Advisory Committee Note to 1991 Amendment.

In response to the Rule 52 Motion, Plaintiff's counsel initially argued that the standard governing the court's task under Rule 52 is essentially the same as the standard under Rule 50. He urged the court to draw inferences in his client's favor, much as the court did under Rule 56 and as a court in a jury trial would, before taking the case from the jury. After the court recessed, counsel candidly conceded his error, confirming the court's view that findings under Rule 52(c)

---

[8] Here, the Plaintiff contends that the absence of equity in the Property is in the nature of an affirmative defense that the Defendants must establish to avoid liability. The Defendants contend, however, that to prove a case for breach of fiduciary duty the Plaintiff must establish a breach of duty and cannot do so if (as Defendants argue) the Property is wholly encumbered. Because, as explained below, the evidence overwhelmingly establishes the absence of equity, the court need not identify which party bears the burden of proof on the value proposition. The proof on these questions is clear.

are the same as in any bench trial, with the caveat that the party against whom the motion is directed has been fully heard on the issue.

Indeed, despite the initial confusion, there are important distinctions between the court's role in considering a motion for directed verdict under Rule 50 and one for judgment on partial findings under Rule 52(c). *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554 (1990) (explaining difference between former standards under Rule 41 and Rule 50). As under its pre-1991 predecessor, the court's evaluation differs from that under Rules 50 or 56, which are designed to remove questions from the fact finder. *Id.* Instead, "[a] judgment on partial findings is made after the court has heard all the evidence bearing on the crucial issue of fact, and the finding is reversible only if the appellate court finds it to be "clearly erroneous." *See* Fed. R. Civ. P. 52(c), Advisory Committee Note to 1991 Amendment. A court that enters judgment on partial findings, like one that enters judgment at the conclusion of all evidence, must nevertheless state its findings of fact and conclusions of law separately, in accordance with Rule 52(a). *See* Fed. R. Civ. P. 52(c).

From early in the case, certainly predating the Defendants' first motion for summary judgment, the value of the Property, and the implications of that value on any evaluation of Mr. Tibble's duties as trustee, took center stage. Indeed, because of the importance of the issue, and the factual dispute surrounding it, the court denied the Defendants' Third Motion for Summary Judgment (AP ECF No. 184), a week after they filed it, without putting the Plaintiff to the expense of responding to it.

Because the dispute about the value of the Property stubbornly interfered with the court's assessment of Mr. Tibble's administration of the asset, the court concurred in the Defendants' suggestion (made during a pretrial conference on October 14, 2015) to hold a

separate hearing to consider value and its impact on the analysis. *See* Fed. R. Civ. P. 42(b) ("to expedite and economize, the court may order separate trial on one or more separate issues").

At a pretrial hearing on the Defendants' motion *in limine,* the court discussed with the parties their expectations of what would occur during the first phase of the bifurcated trial. *See, generally,* Transcript of Hearing on Motion *in Limine* held December 17, 2015 (AP ECF No. 243) at 22:14 to 29:2. New Products's counsel stated that, at the first phase of the trial, the court would consider "the issue of value and essentially was there some equity for unsecured creditors that would trigger a duty on the part of Mr. Tibble to preserve the property; and then, you know, what occurred during various points of his tenure or with the property that would affect the value?" *Id.* at 22:17-21. This understanding was consistent with the court's view of the case, and its decision to hear testimony regarding the "central issue" of value, given its close relationship to a trustee's performance of his duty:

> As the court has observed in this Order and throughout the proceeding, whether Mr. Tibble owed a duty to use estate resources to preserve the property depends almost entirely on whether there was equity in the property, above the encumbrances against it, including but not limited to the mortgage the Plaintiff now holds. *See, e.g.*, Memorandum of Decision and Order dated December 18, 2014 (DN 69) at p. 10 ("Where a particular piece of estate property is fully encumbered, a trustee ought not to expend estate resources to protect or preserve that property, because the benefit of the expenditure inures to the secured creditors at the expense of the unsecured.").

*See* Order Denying Parties' Summary Judgment Motions and Bifurcating Issues for Trial (AP ECF No. 188) at p. 4.

This opinion, including the following passages, constitutes the court's findings of fact and conclusions of law, as required by Rule 52(a) and (c).

## II. FINDINGS OF FACT

### A.   Generally

The Debtor filed its chapter 7 bankruptcy petition on January 26, 2009 (the "Petition Date"), thereby creating a bankruptcy estate that included the Property.  BOA filed a proof of claim in the Debtor's bankruptcy for $1,275,912.01 that was secured in part by the Property.

With the consent of BOA, the Trustee unsuccessfully attempted to sell the Property to Ox Creek Development, LLC ("Ox Creek") for between $590,000.00 and $650,000.00 -- considerably less than the Property's pre-petition appraised value of $1,050,000.00 -- after negotiating a modest carve-out in exchange for the estate's role in the sale process.  Again with BOA's consent or acquiescence, the Trustee also negotiated a pre-sale option agreement, and licensed or "leased" the parking lot for a golf event, generating additional funds.  Though BOA might have argued that the option and lease payments represented proceeds of its collateral, it did not advance the argument and simply permitted the estate to keep these modest fruits of the Trustee's various negotiations despite their relationship to the collateral.

When, roughly four years after the commencement of the Debtor's case, it became clear that the Trustee's sale efforts would fail, BOA conducted an auction to sell its promissory notes, mortgages and other loan documents (the "Loan Documents"), eventually assigning them  to New Products on March 4, 2013, for $225,000.00.

On April 4, 2013, Berrien County filed a motion for relief from the automatic stay to permit it to pursue tax foreclosure proceedings (BC ECF No. 121).  Shortly after the taxing authority filed its motion, and soon after the assignment of the loan documents from BOA to

New Products,[9] the Trustee filed his final report, giving notice of his proposed distributions and deemed abandonment of property -- including the Property at issue in this opinion --  pursuant to § 554(c). *See* Trustee's Final Report (TFR) filed June 10, 2014 (the "TFR," Exh. 25).

New Products objected to the TFR and shortly thereafter, on September 27, 2013, commenced this adversary proceeding against the Trustee and his surety, complaining of the Trustee's neglect and mistreatment of the Property.  Given the allegations of the Trustee's neglect, the court was unwilling to approve the TFR without an evidentiary hearing, and so the Trustee withdrew his report.

The Trustee eventually abandoned the estate's interest in the Property, effective as of January 6, 2014, following the expiration of an additional notice period for environmental regulators, over New Products's objection.  *See* Objection by Creditor New Products Corporation to Trustee's Notice of Proposed Abandonment and Request for Hearing (BC ECF No. 166).

B.      The Property and its Value

The Property is a manufacturing facility situated on approximately 12 acres in Benton Harbor, Michigan.  The main building, initially constructed in 1936, consisted of approximately 127,000 square feet at one time used for manufacturing, office, and related purposes.  More specifically, the Debtor used the Property in the production of molded plastics since its inception.  The Property served as collateral for loans the Debtor obtained from BOA.  As of the Petition Date, the Debtor owed BOA $1,275,912.01 (Exh. BBBB).  Prior to the filing of the Debtor's bankruptcy petition on January 26, 2009, the Debtor had experienced financial

---

[9] From the various objections to the Trustee's proposals that New Products filed while it held only an unsecured claim, it must have been clear to the Trustee, after the Assignment Date, that he could no longer count on cooperation from the holder of the principal secured claim against the Property.

difficulties rendering it unable to meet its obligations to BOA, state and local taxing authorities, among other creditors including New Products.  Deferred maintenance compromised the integrity of the roof, resulting in pools of standing water within the building which were visible during a prepetition auction of equipment conducted at the behest of BOA (Exh. 30).  During the Trustee's only visit to the building interior at the Property in January 2009, his credible testimony established the Property was in a deplorable and unsafe condition.

On December 29, 2008, in the course of winding down its operations, the Debtor agreed to sell the Property, with BOA's approval, to Ox Creek for $650,000.00 (the "First Proposed Sale").  *See* Purchase Agreement dated December 29, 2008 (Exh. VV).  Ox Creek was reportedly involved in the development of the Harbor Shores golf course.

Several months after the Petition Date, the Trustee agreed to complete the sale to Ox Creek, but through a sale addendum, he allowed a $60,000.00 credit to the buyer at closing, reducing the net sale amount to $590,000.00 (the "Second Proposed Sale") (*id.*).  The First and Second Proposed Sales both depended on BOA's willingness to accept far less than its debt at closing in order to convey clear title.  Moreover, as part of the Second Proposed Sale BOA agreed to remit $10,000.00 to the estate as a carve-out of the Bank's collateral, representing the only meaningful benefit for unsecured creditors from the Property at that time.  Unfortunately, this sale fell through.

Regardless, Ox Creek remained interested in the Property, offering to purchase it for $590,000.00, and agreeing to make option payments for four months to preserve its right to purchase (the "Third Proposed Sale," Exh. YY).  Though Ox Creek and the Trustee structured the Third Proposed Sale in a slightly different manner, the purchase price remained effectively the same as with the Second Proposed Sale.  On September 22, 2009, after notice and an

opportunity for hearing, the court approved the Third Proposed Sale (Exh. ZZ), finding no reason to question at that time the arms-length nature of the negotiation that arrived at the $590,000.00 purchase price.  But, as with the previous sale, this transaction also fell through.

Nevertheless, because there was a buyer in hand on the Petition Date who was willing to pay a $650,000.00 purchase price, the court finds this to be an exceedingly persuasive indicator of the Property's value as of the Petition Date.  This is so, notwithstanding the appraisal report of Professional Appraisal Services, Inc., which suggested a value in 2008 of $1,050,000.00.  Even this report expressed reservations about a declining real estate market, which turned out to be true. (Exh. A).

Significantly, BOA -- the lienholder with the greatest stake in the Property -- blessed the proposed sales at the $650,000.00 and then $590,000.00 amounts, giving rise to a strong inference that the purchase prices fairly represented the value of the Property at the time, even acknowledging that large financial institutions like BOA may have many reasons for their action, or inaction, with respect to collateral.  BOA's willingness to pay the estate a carve-out for the privilege of having the Trustee sell the Property (and keeping the bank out of the chain of title of a potentially contaminated industrial site) may reflect, in part, an aversion to risk or reliance on other collateral, but its willingness to discharge its mortgage for far less than its claim speaks volumes about the lender's dim view of the Property's value.  Indeed, Mr. Siravo's deposition testimony establishes that BOA was unwilling to spend any money to insure its collateral, supporting an inference of less, rather than more, value than the $650,000.00 it was willing to accept prepetition.  Similarly, taking judicial notice of the docket entries in the base case, it is clear that BOA never sought relief from stay to liquidate its collateral, similarly supporting an inference that the bank did not ascribe much value to the Property.  This is not

surprising, given the tax liens, the deferred maintenance and generally poor condition of the Property, and the considerable risk of environmental clean-up costs.  In view of the foregoing, and especially given the proximity of the December 29, 2008 Purchase Agreement to the Petition Date, the court finds (based on the preponderance of the evidence) that the Property was worth not more than $650,000.00 on the Petition Date.

In reaching this decision, the court credits Mr. Tibble's testimony that, notwithstanding the language at the top of the third column on Form 1, he wrote "$600,000.00" to memorialize his preliminary assessment of the value of the Property, rather than the equity in the Property. His testimony establishes his carelessness or inattention while completing the several reporting forms, but his explanation was believable.  Given the explanation, which the court was not privy to when drawing inferences in New Products's favor at the summary judgment stage, the admissions included within the Trustee's reports do not establish equity.

As for the value of the Property three and a half years later -- on the Assignment Date -- likewise, the court finds, based on the preponderance of the evidence, that the $590,000.00 purchase price implicit in the Second Proposed Sale (and expressed in the third) represents the best evidence of value on that later date.

In reaching this conclusion, the court is mindful of the credible testimony from Nicholas Schlipp and his grandfather, Delbert Schlipp, to the effect that, prior to the assignment, the elder Mr. Schlipp and unnamed associates actively harvested metal and other scrap from the Property, five days a week, eight hours a day, for seven months, post-petition.  Although Delbert Schlipp testified that he did not participate in removing structural components from the building, he was not the only scrapper on site, and the photographs introduced as part of Exhibit 40 show structural deterioration resulting from the removal of cinder blocks, support beams, and other

substantial supporting pieces of the building.  This further exposed the premises to the elements and quite likely compromised the integrity of the building.

Although the invoices included as part of Exhibit 44 show that scrappers (and perhaps Mr. Robert Orlaske) benefitted from what can only be described as post-petition looting, the court is unwilling to simply deduct the proceeds of the scrap sales from the $590,000.00 purchase price established in the Third Proposed Sale, without some expert testimony corroborating this method of valuation.

This reluctance also stems from the evidence that shows it was the location of the Property, rather than the structures built upon it, that accounted for most of the value.  For instance, James Ringler from Grubb & Ellis opined in 2008 that the highest and best use for the Property was as a redevelopment site.  (Exh. H).  Referring to enlarged aerial photographs, Ms. Miller showed the proximity of the Harbor Shores golf and residential developments to the Property.  The Trustee testified that in 2009, after he visited the site, he came away with the feeling that the building was dangerous, but was nonetheless able to wring out some income from the real property by leasing it during a golf event at the neighboring golf course.  In addition, the record includes two letters sent from the City of Benton Harbor to the Debtor in December 2011, in essence, condemning the building.  Although the city gives the Debtor the opportunity to bring the structure "up to code," the building inspector suggests that the Debtor consider demolishing it as an alternative.  (Exh. FF).  It is more than simply conceivable that the building itself contributed very little to the value of the Property, especially given its consistently worsening state, as compared to the constancy of the $590,000.00 purchase price. The court has also considered the appraisal of Professional Appraisal Services (Exh. C), which updated its earlier appraisal (Exh. A), and suggested a retrospective estimate of value of

$930,000.00 as of the Petition Date. Again, however, considering the condition of the building (which the author of the appraisal did not inspect) and the impact of environmental concerns which almost certainly would have justified a discount, the court finds the prices consistently reflected in the aborted sales transactions to be more persuasive evidence of value in the admittedly unusual circumstances of this case, even though the sales did not close. There is nothing in the record to suggest that they failed to close because the Trustee or BOA thought the price was too low.

The court has also considered the testimony of Cheryl Miller regarding her view of the Property, her decision to cause New Products to purchase BOA's Loan Documents, and her post-assignment visits to the Property. Although her testimony implied that she was unaware of the post-petition scrapping activity on the premises, she also testified she was regularly at work in the New Products offices. This regular attendance at the office, the proximity of her office to the Property (across the street), and the testimony from Delbert Schlipp regarding the fact that for seven months he and his confederates threw the scrap in dumpsters and hauled it in truckloads from the Property, make it difficult for the court to believe she was unaware of the activity of which she now complains. Indeed, she testified that one of the photographs showing the Property's environs captured the image of her Buick automobile in the New Products parking lot. The court also finds incredible her testimony that, as a sophisticated business person in charge of a self-described global, Tier 1 automotive supplier, she authorized her company to spend $225,000.00 on the Loan Documents with the ultimate purpose of acquiring the Property, without setting foot on the interior of the Property -- unless the condition of the building was immaterial to the decision. She acted, in other words, as if the value of the Property was not dependent on the condition of the structure.

She also testified that, after the Assignment Date, she made regular visits to the Property during which she photographed the interior, evidently in an effort to document the Trustee's failure to adequately protect her newly-acquired collateral, which she said was deteriorating due to the elements and continued scrapping. Yet, as far as the docket shows, her company did not file any motions for relief from the automatic stay, for adequate protection, or to compel abandonment. In other words, aside from building a case against the Trustee in the months following the assignment by chronicling the deterioration, New Products behaved just as its predecessor (BOA) had -- unwilling itself to spend money to preserve the Property or even to take action to compel the Trustee to do so. This similarly cavalier approach to the building -- by the first lienholders pre and post-assignment -- bears on the court's conclusion that the value of the Property was largely driven by its location rather than the improvements. If BOA and New Products behaved in this manner with respect to the Property, it probably explains why the Trustee did, too.

C.       Encumbrances and Equity

As for the amount of the encumbrances, the court relies largely on the parties' Stipulation of Facts (Exh. BBBB) and finds that the liens of the State of Michigan Unemployment Insurance Agency ("MUIA"), BOA and the Berrien County Treasurer totaled $1,608,610.35 as of the Petition Date (*see* Exh. BBBB at ¶ 2). Based on that same exhibit, the court finds that BOA received payment of $239,639.87, from the sale of other collateral on August 13, 2010 (*id.* at ¶ 3), which reduced its claim, and therefore its lien, by that amount. Moreover, by March 4, 2013, Berrien County had asserted a tax lien against the Property in the amount of $307,182.36 (*id.* at ¶ 4). Because the record includes no evidence that in any way

challenges the Berrien County tax lien, the court finds that the tax lien in the amount of $307,182.36 also encumbered the Property to that extent on the Assignment Date.

To summarize, the liens on the Petition Date, in the aggregate of $1,608,610.35 exceeded the value of the Property on that date ($650,000.00) by approximately $958,610.00. As of the Assignment Date, due largely to the $180,306.00 increase in the Berrien County tax lien, but also reflecting the $239,639.00 reduction in BOA's claim on account of the sale of collateral in Coloma, Michigan, liens against the Property at that time ($1,549,277.00) exceeded the value of the Property ($590,000.00) by approximately $959,277.00.

## III.  CONCLUSIONS OF LAW

The point of bifurcating the value issue from other issues, such as damages, was to permit the court to determine whether the condition or value of the Property was such that "an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view" would have behaved as Mr. Tibble allegedly did. *See Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461-62 (6th Cir. 1982); *United States ex rel Central Savings Bank v. Lasich (In re Kinross Mfg. Corp.)*, 174 B.R. 702, 705 (Bankr. W.D. Mich. 1994).

Although bankruptcy professionals and courts generally acknowledge that a bankruptcy trustee has a duty to preserve property of the estate, the relevant statute frames the fiduciary's obligation differently:  "The trustee shall . . . be accountable for all property received."  11 U.S.C. § 704(a)(2).  This concept of accountability recognizes the extremely difficult job of a bankruptcy trustee who, after all, is a fiduciary of an estate in which numerous beneficiaries or stakeholders hold competing and often conflicting interests.  To hold that a trustee, in order to "account" to secured creditors has an *unqualified* duty to spend money to preserve fully-

encumbered estate property would make it impossible for the same trustee to "account" to the

unsecured creditors.  By framing the trustee's duty more flexibly in terms of accountability

rather than preservation, the drafters recognized the collective nature of the proceeding, and the

frequently divergent interests in the case and the property of the estate.  As in most bankruptcy

controversies, a trustee must be guided by the need to maximize value for the estate, not just

secured creditors (for whom the Bankruptcy Code affords ample protection).

As the court observed in response to the Defendants' summary judgment motion over a

year ago:

> Where a particular piece of estate property is fully encumbered,
> a trustee ought not to expend estate resources to protect or
> preserve that property, because the benefit of the expenditure
> inures to the secured creditors at the expense of the unsecured.
> *See, e.g., United States ex rel. Central Savings Bank v. Lasich
> (In re Kinross Mfg. Corp)*, 174 B.R. 702 (Bankr. W.D. Mich.
> 1994). Stated differently, a trustee should not spend money that
> would otherwise go to unsecured creditors to prop up the
> collateral of a particular secured creditor. *Cf.* 11 U.S.C. § 506(c).
> Of course, as a practical matter, it is frequently difficult to know
> the value of a thing or parcel of property.  As long as the
> property is within a trustee's legal custody, however, a trustee
> may be duty-bound to preserve it.

*See* Memorandum of Decision and Order dated December 18, 2014 (AP ECF No. 69) at p. 10.

Indeed, in ruling on the Defendants' prior summary judgment motions, if there had been "no

genuine issue" that the Property was substantially underwater, the court would have dismissed

the law suit over a year ago -- and practically said as much at that time.  *Id.*  At that time, the

court also stated:

> . . . if the Property promised no benefit to the estate, the Trustee
> would have no need or justification to use unencumbered estate
> resources to preserve it.  Indeed, unsecured creditors could
> justifiably complain under those circumstances if the Trustee
> used estate property to benefit BOA at their expense:  if the
> Property were truly underwater, it would be perfectly reasonable

> not to spend money to insure it indefinitely, fence it, or otherwise
> maintain it, or seek to reduce a tax assessment, for example.

*Id.* at p. 11-12.  The court regards these statements as the law of the case, which constitute "controlling law" within the meaning of Rule 52(c).  *Entertainment Productions, Inc. v. Shelby County*, 721 F.3d 729 (6th Cir. 2013) ("[u]nder the law-of-the-case doctrine, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation").

In the course of the hearing to determine value, the court carefully considered the manner in which BOA treated the Property, or more accurately, refrained from treating the Property, relying on the deposition testimony of BOA's Mr. Siravo as well as the credible testimony of Mr. Tibble.  Similarly, the court considered the manner in which Ms. Miller responded.  Significantly, the three most interested stakeholders -- BOA, New Products, and the Trustee -- took no steps to preserve the building, suggesting that its contribution to the value of the Property would not warrant the effort.

Having concluded that the utter absence of equity -- where liens exceeded the value of the Property by over $950,000.00 -- the court finds that the value-related evidence amply establishes the Defendants' defense.  *Eberhardt*, 171 B.R. at 243.  The court, and the Code, support his theory -- that the substantial negative equity justified the Trustee's conduct.  This defense, in the language of Rule 52(c), is one that "can . . . be defeated only with a favorable finding" on the question of equity.  After the Plaintiff has been fully heard on the question of equity, the court has found in favor of the Defendants on that issue.

The court is unimpressed with New Products's novel suggestion that the Trustee should have done more in order to maximize the carve-out, option payments, or rental income.  Each of these benefits to the estate depended not simply on the Trustee's efforts and negotiation

skills, but on the cooperation of the first secured lender.  A carve-out is not equity, it is the product of a secured creditor's self-interested consent to share its collateral position with the estate, generally in exchange for the benefit of disposing of collateral through the bankruptcy process, rather than through foreclosure with its attendant risks and delay.  Permitting the estate to earn rental income and option payments -- through the use of BOA's collateral -- depends on the agreement of the secured creditor.  That the Trustee was able to derive some benefit from the Property without paying to fix or even fence the building shows that he maximized value for the estate and did so with the agreement of BOA.  As the court observed earlier, New Products cannot now second-guess its assignor's decision to cooperate.  And, with respect to the suggestion that the Trustee should have abandoned the property sooner given the absence of equity, the court is similarly unpersuaded.  The statute provides that the Trustee "*may* abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a) (emphasis added).  The modest success that the Trustee had in getting BOA to agree that the estate could keep the carve-outs, option payments, and parking lot revenue, and do so without spending estate resources on the Property, justifies the Trustee's decision to postpone abandonment for as long as he had the cooperation of the entity holding the first lien.[10]

Given the complete absence of equity, and the relative unimportance of the building in the evaluation of the Property, the court finds that Mr. Tibble behaved as "an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view" would have behaved, and in fact as BOA and New Products behaved before, and

---

[10] In his TFR, filed roughly three months after the Assignment Date, and shortly after Berrien County filed its stay relief motion, the Trustee proposed to abandon the Property.  New Products opposed the abandonment by objecting to the TFR, and later in response to the Trustee's separate motion to abandon the Property.

immediately after, the assignment, respectively.  *Weaver*, 680 F.2d at 461-62; *In re Kinross Mfg. Corp.*, 174 B.R. at 705.

Accordingly, the court will direct the Clerk to enter judgment dismissing the case.

### IV.  CONCLUSION AND ORDER

The court's impression of this case is certainly mixed.  On the one hand, the photographs showing the devastating effects of the scrappers' post-petition harvest of copper, steel, and other materials is shocking, if not revolting.  However, trustees, secured creditors, and even bankruptcy judges must approach assets unsentimentally in a system designed to "collect and reduce to money the property of the estate for which the trustee serves . . ."  11 U.S.C. § 704(a) (the first duty of a chapter 7 trustee).  Understanding, as the court does, that BOA and the trustee agreed expressly or impliedly to neglect the building because it did not make economic sense to do otherwise makes it easier to accept what happened to it in this case.  The court would understand, however, if Ms. Miller does not see the situation in the same way, given her family's history with the Debtor and the Property.  Nevertheless, the Trustee's conduct did not give rise to a claim for damages, despite the damage it may have inflicted on his reputation, given the litigation and other risks he assumed by administering the Property as he did. *See, especially, supra* n.5.

Finally, although the Bankruptcy Code stacks the deck in favor of secured creditors, especially in a chapter 7 case, secured creditors must play the hand they are dealt. *See, e.g.,* 11 U.S.C. §§ 362(d), 363(e), 554(b).  The observation of the Honorable James D. Gregg, with respect to adequate protection, bears repeating:  "if you don't ask for it, you won't get it." *In re Kain*, 86 B.R. 506, 512 (Bankr. W.D. Mich. 1988).  Here, nobody asked. Precluding recovery

under the circumstances of this case is consistent with this principle, and protects the estate and its unsecured creditors from an end-run around the statutory scheme.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Rule 52 Motion is GRANTED and the Clerk shall enter judgment dismissing the Complaint.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Melissa L. Demorest, Esq., Mark S. Demorest, Esq., John Chester Fish, Esq., Cody H. Knight, Esq., Matthew Cooper, Esq., Elizabeth M. Von Eitzen, Esq., Mathew Cheney, Esq., and the United States Trustee.

END OF ORDER

**IT IS SO ORDERED.**

**Dated January 21, 2016**



Scott W. Dales
United States Bankruptcy Judge